# United States Court of Appeals
## For the First Circuit

No. 09-1314

ANTILLES CEMENT CORPORATION,

Plaintiff, Appellee,

v.

LUIS FORTUÑO, Governor of the Commonwealth of Puerto Rico;
ANTONIO M. SAGARDÍA-DE-JESÚS, Secretary of the Department of
Justice; LUIS G. RIVERA-MARÍN, Secretary of the Department of
Consumer Affairs; RUBEN A. HERNÁNDEZ-GREGORAT, Secretary of the
Department of Transportation and Public Works,

Defendants, Appellants,

CEMEX DE PUERTO RICO, INC., f/k/a Puerto Rican Cement Co., Inc.,

Defendant.

---

No. 09-1583

ANTILLES CEMENT CORPORATION,

Plaintiff, Appellee,

v.

CEMEX DE PUERTO RICO, INC., f/k/a Puerto Rican Cement Co., Inc.

Defendant, Appellant,

LUIS FORTUÑO, Governor of the Commonwealth of Puerto Rico;
ANTONIO M. SAGARDÍA-DE-JESÚS, Secretary of the Department of
Justice; LUIS G. RIVERA-MARÍN, Secretary of the Department of
Consumer Affairs; RUBEN A. HERNÁNDEZ-GREGORAT, Secretary of the
Department of Transportation and Public Works,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jamie Pieras, Jr., U.S. District Judge]

———————————

Before

Howard, Selya and Thompson,
Circuit Judges.

———————————

Angel E. Rotger-Sabat, with whom Maymí, Rivera & Rotger, P.S.C. was on brief, for appellant Commonwealth of Puerto Rico.
Juan Ramón Cancio-Ortiz, with whom José Raúl Cancio-Bigas, Charles E. Vilaró-Valderrábano and Cancio Covas & Santiago, LLP were on brief, for appellant Cemex de Puerto Rico, Inc.
Hector Saldaña-Egozcue, with whom Carlos Lugo-Fiol and Saldaña & Saldaña-Egozcue, PSC were on brief, for appellee.

———————————

January 17, 2012

———————————

**HOWARD**, **Circuit Judge**.  These appeals present two complex questions of first impression:  Does the Buy American Act (BAA), 41 U.S.C. §§ 8301-8305 (formerly codified at 41 U.S.C. §§ 10a-10d), preempt two Puerto Rico statutes?  And if not, do those Puerto Rico statutes unconstitutionally interfere with Congress's power to regulate foreign commerce?

The district court initially struck down the two local laws on the ground that they contravene the dormant Foreign Commerce Clause.  Antilles Cement Corp. v. Calderón (Antilles I), 288 F. Supp. 2d 187, 197-202 (D.P.R. 2003).  On appeal, we vacated that decision and remanded for consideration of the role of the BAA.  Antilles Cement Corp. v. Acevedo Vilá (Antilles II), 408 F.3d 41, 47-49 (1st Cir. 2005).  On remand, the district court again invalidated the local laws, this time concluding that they are preempted by the BAA.  We affirm in part and reverse in part.

## I.  BACKGROUND

We presume the reader's familiarity with our prior decision in this matter and recount here only the facts needed to illuminate the issues under appeal.  Additional background may be found in the related district court decisions.  See Antilles Cement Corp. v. Calderón (Antilles IV), No. Civ. 02-1643, slip op. (D.P.R. Jan. 9, 2009); Antilles Cement Corp. v. Acevedo Vilá (Antilles III), No. Civ. 02-1643, 2005 WL 2138753 (D.P.R. Sept. 1, 2005); Antilles I, 288 F. Supp. 2d 187.

## A. **The Statutes at Issue**.

The BAA was enacted during the Great Depression to promote American industry and jobs by requiring that certain public projects use only domestically produced materials. See United States v. Rule Indus., Inc., 878 F.2d 535, 538 (1st Cir. 1989); see also 76 Cong. Rec. 1892 (1933) (statement of Rep. John J. Cochran) ("In times such as we are now experiencing let us put American labor to work on Government supplies and material."); see generally Charles F. Szurgot, Comment, The Buy American Act: Reverse Discrimination against Domestic Manufacturers; Implications of the Trade Agreements Act of 1979 on the Rule of Origin Test, 7 Admin. L.J. Am. U. 737, 739-40 (1993). Specifically, the BAA ordains, subject to certain exceptions, that only materials that are mined, produced, and/or manufactured in the United States may be employed for "public use" or utilized in the construction, alteration, or repair of "any public building or public work." 41 U.S.C. §§ 8302-8303. "Public building," "public use," and "public work" are terms of art, defined as "a public building of, use by, and a public work of, the Federal Government, the District of Columbia, Puerto Rico, American Samoa, and the Virgin Islands." Id. § 8301 (emphasis supplied).

We turn now to the two local laws that are challenged here. The first, P.R. Laws Ann. tit. 3, §§ 927-927h (Law 109), is a preference statute enacted in 1985 to promote the Puerto Rican

-4-

construction industry. It requires that local construction projects financed with funds from the federal government or the Commonwealth use only "construction materials manufactured in Puerto Rico," id. §§ 927a-927c, with certain limited exceptions relating to the price, quality, and available quantity of local materials, id. § 927e. Of particular pertinence for present purposes, cement is deemed "manufactured in Puerto Rico" only if it is composed entirely of raw materials from Puerto Rico (unless a particular component is unavailable in industrial quantities locally). Id. § 927(d).

The second challenged statute is P.R. Laws Ann. tit. 10, § 167e (Law 132). Enacted in 2001, it imposes certain labeling requirements on cement sold in Puerto Rico. Among other things, Law 132 requires that foreign-manufactured cement carry a special label warning against its use in government-financed construction projects unless one of the exceptions contained in the BAA and Law 109 applies. See id. § 167e(a)(4). Law 132 also prohibits the sale or distribution of foreign-manufactured cement that is not so labeled and imposes fines for any violation of the labeling requirements. See id. §§ 167e(b), 167f.

## B. **Travel of the Case**.

Antilles Cement Corporation, a firm that imports foreign cement, commenced this action by filing a complaint in the United States District Court for the District of Puerto Rico. Antilles

sought a declaratory judgment that Laws 109 and 132 violate the dormant Foreign Commerce Clause and conflict with the BAA. In the early going, Antilles amended its complaint to withdraw the BAA preemption claim.

The district court initially granted summary judgment for Antilles, concluding that Laws 109 and 132 as applied to foreign materials violate the dormant Foreign Commerce Clause. See Antilles I, 288 F. Supp. 2d at 197-202. On direct review, we questioned whether the BAA might preempt the laws being challenged, thereby obviating the need for constitutional analysis. See Antilles II, 408 F.3d at 47-49. Moreover, we found the record lacking in factual development. See id. at 49-51. Given these concerns, we vacated the lower court's decision and remanded to determine (1) whether the BAA applies to public projects undertaken by the Commonwealth of Puerto Rico, and, if so, whether it preempts Law 109; (2) whether Law 109 has been applied only to the Commonwealth's own construction projects or, conversely, whether it has been applied to private construction projects subsidized in part by government funds;[1] and (3) whether the status of Law 132 was altered in light of the answers to these first two questions. See id. at 51.

---

[1]This factual determination is relevant to whether the Commonwealth acts as a market participant or a market regulator when it enforces Law 109.

On remand, the district court concluded that the BAA applies to public projects undertaken by the government of Puerto Rico. See Antilles IV, No. Civ. 02-1643, slip op. at 58-64. It further concluded that the BAA preempts Laws 109 and 132 because the Puerto Rico statutes limit the use of foreign construction materials more stringently than the BAA requires. Id. at 64-66. In view of this holding, the court recognized the lack of need for further constitutional analysis. Id. at 67. Nonetheless, in compliance with our mandate, the court determined that Law 109 has been applied only to public works projects undertaken by the Commonwealth itself. Id. at 67-68.

The Commonwealth and Cemex de Puerto Rico, Inc., an intervenor, now appeal.

## II. PRELIMINARY MATTERS

At the threshold, we must address the appellants' contention that Antilles lacks standing to challenge Laws 109 and 132 under a preemption theory. According to the appellants, Antilles stands to gain nothing by arguing that the BAA trumps the Puerto Rico statutes; for even if Antilles successfully advances that challenge, its cement would nevertheless remain barred from use in the Commonwealth's public works projects under the terms of the BAA itself. Although the appellants failed to raise this argument during the remanded proceeding, Article III standing is a jurisdictional question that must be resolved whenever it arises.

-7-

See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 467 (1st Cir. 2009).

To establish Article III standing, Antilles must allege "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." Id. (internal quotation marks omitted). The loss of sales resulting from the local laws' discrimination against foreign cement is plainly a "concrete and particularized injury" to Antilles that is traceable to the challenged laws. Our inquiry must therefore focus on the final element of standing: whether Antilles's injury will be redressed if Laws 109 and 132 are held to be preempted by the BAA.

To carry its burden of establishing redressability, Antilles need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm. See, e.g., Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2752-54 (2010) (holding that plaintiffs had standing to challenge an injunction preventing them from planting a regulated crop, even though a decision vacating the injunction would enable plaintiffs only to petition for partial deregulation); see also Weaver's Cove, 589 F.3d at 467-68 (holding that a favorable decision would provide plaintiff "effectual relief" by removing "a barrier to achieving approval" even though additional regulatory hurdles would need to be cleared

-8-

before project could be commenced). Antilles has met that requirement here. As we explain below, the BAA provides significantly greater opportunity than does Law 109 for suppliers of foreign cement to participate in the Commonwealth's public construction projects. Accordingly, Antilles stands to benefit if Law 109 is nullified, leaving the company subject only to the looser strictures of the BAA.

A simple side-by-side comparison of the BAA and Law 109 underscores the more formidable burden that the Puerto Rico statute places on sellers of foreign cement. For example, under the BAA, a construction material is considered "domestic" if it is manufactured in the United States and if the cost of its components that were mined, produced, or manufactured in the United States exceeds half of its total component cost. See 48 C.F.R. § 25.003; see also Exec. Order No. 10582, 19 Fed. Reg. 8723 (Dec. 17, 1954). Pursuant to this definition, concrete manufactured from foreign cement could be considered a domestic product (and thus eligible for use in public paving projects) because, according to record evidence, cement represents only about 42 percent of the cost of concrete's components. By contrast, Law 109 would rarely permit the public use of concrete made with foreign cement due to its requirement that all cement used in public works be manufactured using raw materials from Puerto Rico. See P.R. Laws Ann. tit. 3, § 927(d). Obviously, the opportunities for Antilles to sell its cement in Puerto Rico would be greater under the BAA because that

law allows concrete manufacturers who sell to the Commonwealth to purchase and employ foreign cement.

The BAA also permits government purchasers to ignore the domestic preference rule if adherence is impracticable or not in the public interest, see 41 U.S.C. §§ 8302-8303, or if the domestic material is greater than six percent more expensive than its foreign counterpart, see id.; 48 C.F.R. § 25.204(b). Law 109's exceptions are much narrower: domestic preferences may be ignored only when indigenous construction materials are not available in sufficient quantity or quality, see P.R. Laws Ann. tit. 3, § 927e(b), or if the domestic material is at least fifteen percent more expensive than a comparable foreign-made material, see id. § 927e(a); Antilles II, 408 F.3d at 44. Given the relative strictness of Law 109's domestic preference requirements, Antilles would be more likely to sell its cement to contractors carrying out public works projects in Puerto Rico if that law were preempted by the BAA.

Law 132 is susceptible to a similar comparative analysis. Unlike that law, the BAA does not impose any burdensome labeling requirements on sellers of foreign cement. According to the evidence of record, those idiosyncratic labels frighten away potential customers.

In sum, Laws 109 and 132 place more onerous burdens on Antilles than does the BAA. Antilles has therefore demonstrated

-10-

that its injury would at least be alleviated by a finding that the BAA preempts Laws 109 and 132.

One other bit of procedural underbrush must be cleared before we can proceed to the merits of these appeals. The appellants contend that Antilles waived its preemption claim by failing to amend its complaint to reassert that claim after we sent the case back to the district court. The district court determined that it could consider the issue even without a formal amendment because the Commonwealth and Cemex had fair warning that BAA preemption would be litigated. We review that determination for abuse of discretion. See Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 232 (1st Cir. 2003).

Federal Rule of Civil Procedure 15(b) allows an unpleaded claim to be considered when the parties' conduct demonstrates their express or implied consent to litigate the claim. See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995). The rule provides in relevant part:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). A party can give implied consent to the litigation of an unpleaded claim in two ways: by treating a claim introduced outside the complaint "as having been pleaded, either

-11-

through [the party's] effective engagement of the claim or through his silent acquiescence"; or by acquiescing during trial "in the introduction of evidence which is relevant only to that issue." Doral Mortg., 57 F.3d at 1172.

Here, the appellants plainly gave their implied consent to the adjudication of the preemption claim. For one thing, they never objected when it became clear that BAA preemption would be at the heart of the remanded proceeding. At its first scheduling conference following remand, the district court discussed with the parties the scope of the Antilles II mandate. When the court issued its scheduling order, it listed the BAA's preemptive effect among the controverted issues. There was no objection. The parties then engaged in extensive discovery, which included numerous matters related to the BAA and preemption. Later, the parties briefed several issues, including the applicability of the BAA to Puerto Rico and its preemptive effect. Throughout all of these proceedings, the appellants never suggested that BAA preemption went beyond the scope of the issues properly before the district court. Indeed, the appellants joined the preemption issue by arguing that the BAA represented a congressional authorization of the challenged statutes.

By actively contesting the BAA preemption claim on the merits, the appellants effectively conceded that it had been incorporated into the complaint. Moreover, given the extensive notice that BAA preemption would be litigated upon remand, see,

e.g., Antilles II, 408 F.3d at 47-49, the appellants cannot show that they were prejudiced by the court's consideration of that issue.[2]  We therefore uphold the district court's ruling that the BAA preemption claim was properly before it.

## III.  THE MERITS

The parties have stipulated to the salient facts, and the issues before us are legal in nature.  Those issues engender de novo review.  See Morales Feliciano v. Rullán, 378 F.3d 42, 49 (1st Cir. 2004).

### A.  Preemption.

According to the district court, Laws 109 and 132 unduly restrict Puerto Rico's ability to procure foreign materials for its public projects and, in the process, undermine the BAA's delicate balancing of protectionism and foreign trade and its policy of encouraging flexibility in procurement decisions.  We do not agree.

As a preliminary matter, the appellants concede (as they must) that the BAA places restrictions on federal construction projects in Puerto Rico.  They likewise concede that Law 109, which purports to govern public projects that are financed with either

---

[2]The cases cited by the appellants in which implied consent was not found are inapposite.  See, e.g., United States v. Davis, 261 F.3d 1, 59 (1st Cir. 2001) (finding no abuse of discretion when court denied plaintiff's belated request to amend complaint); Rodriguez v. Banco Cent. Corp., 990 F.2d 7, 13-14 (1st Cir. 1993) (affirming denial of motion to amend where claim raised far into discovery); Campana v. Eller, 755 F.2d 212, 215-16 (1st Cir. 1985) (same).  In none of those cases did the parties, at the court's direction, engage the issue in question.

federal or Commonwealth funds, see P.R. Laws Ann. tit. 3, § 927(f), is preempted by the BAA to the extent that it tries to restrict federal projects in Puerto Rico. But the appellants dispute the district court's ruling that the BAA preempts Laws 109 and 132 as they apply to public projects that are funded by the Commonwealth. Refined to its bare essence, the appellants' argument is that the Commonwealth has the same degree of sovereignty as the several states; and that because the BAA does not pertain to state governments, it should not be construed to restrict public projects undertaken by Puerto Rico.

We reject the appellants' contention that the BAA has no application to Puerto Rico. Whether and how a federal statute applies to Puerto Rico is a question of Congressional intent. Jusino Mercado v. Puerto Rico, 214 F.3d 34, 40 (1st Cir. 2000). The critical inquiry in this instance, then, is whether Congress intended for Puerto Rico to be treated as a state under the BAA. See id. Because this poses a question of statutory interpretation, we employ the usual tools. See In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 168 (1st Cir. 2009) (limning general principles of statutory construction). We must evaluate the statute's language within the statutory scheme and look to the legislative history and policy only if that language is unclear. See Gen. Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006).

-14-

Under the express terms of the BAA (and leaving its exceptions to one side), only domestic materials may be acquired for "public use" or used in the construction, alteration, or repair of any "public building" or "public work." 41 U.S.C. §§ 8302-8303. The statute applies only to "a public building of, use by, and a public work of, the Federal Government, the District of Columbia, Puerto Rico, American Samoa, and the Virgin Islands." Id. § 8301 (emphasis supplied). By its plain terms, then, the BAA encompasses public construction projects undertaken by the government of Puerto Rico. We find this explicit language dispositive. See In re Pharm. Indus., 582 F.3d at 168 ("The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." (quoting Textron Inc. v. Comm'r of Internal Revenue, 336 F.3d 26, 31 (1st Cir. 2003))).

The appellants attempt to dampen the impact of the BAA's plain language by arguing that the explicit reference to Puerto Rico is a vestige of a time when Puerto Rico was a federally administered territory. They point out that, more than a decade after the BAA's enactment in 1933, Puerto Rico was transformed from a territory into a self-governing commonwealth. See Federal Relations Act of 1950 (FRA), Pub. L. No. 81-600, 64 Stat. 319 (codified at 48 U.S.C. §§ 731b-731e). In Cordova & Simonpietri Insurance Agency Inc. v. Chase Manhattan Bank N.A., we recognized

-15-

that, following the adoption of the FRA, federal statutes that had applied to Puerto Rico as a territory might no longer pertain to it in its capacity as a commonwealth.  649 F.2d 36, 38 (1st Cir. 1981).  The appellants argue that the BAA is such a statute.  They contend that the BAA's framers would not have intended for the law to apply to an autonomous commonwealth like Puerto Rico and that the words "Puerto Rico" remain in the statute due only to the inadvertence of subsequent Congresses.

This argument is not without some force, but it is defeated by the fact that Congress recently overhauled the BAA yet left the words "Puerto Rico" intact. See Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3830-33.  The stated purpose of this overhaul was to clarify ambiguities in the BAA (and other laws codified in Title 41 of the United States Code) and better effect the intent of the drafters of those laws.  See id. § 2, 124 Stat. at 3677.  As part of this legislative refurbishment, among other things, Congress restructured and re-enacted the BAA, removed the "[Panama] Canal Zone" from the list of covered entities, and rechristened the "United States" as "the Federal Government."  Yet Congress did not delete the BAA's reference to Puerto Rico.  We can think of no better indicator of Congress's intent to continue to include Puerto Rico within the reach of the BAA than its overhauling the BAA yet preserving the law's explicit application to the Commonwealth.

Even beyond this recent overhaul, we note that Congress historically has been diligent in amending the BAA to remove entities that it no longer intends to cover. For example, when the BAA was initially enacted, it expressly applied to the territories of Alaska and Hawaii. But when Alaska and Hawaii achieved statehood, Congress amended the BAA to remove them from its purview. See Hawaii Omnibus Act, Pub. L. No. 86-624, § 28, 74 Stat. 411, 419 (1960); Alaska Omnibus Act, Pub. L. No. 86-70, § 43, 73 Stat. 141, 151 (1959). Congress's failure similarly to amend the BAA following the FRA's enactment strongly suggests an intent that the BAA continue to apply to Puerto Rico. See Caribbean Tubular Corp. v. Fernandez Torrecillas, 67 B.R. 172, 175 (D.P.R. 1986) ("[H]ad Congress intended to oust Puerto Rico from the coverage of the BAA it would have done so in 1959 when it excluded Alaska and Hawaii.").

Cordova does not compel a different conclusion.[3] There, we observed that following passage of the FRA Puerto Rico now enjoys "the degree of autonomy and independence normally associated with a State of the Union." 649 F.2d at 41 (quoting Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 594 (1976)). But we recognized that Puerto Rico is not a state. See id. (referencing Puerto Rico's "unique status of

_____

[3]In Cordova, we determined that the Sherman Act applies in Puerto Rico the same as it does in any state in part because the law did not expressly refer to the Commonwealth. 649 F.2d at 42. The BAA, by contrast, explicitly references Puerto Rico.

-17-

Commonwealth").  Accordingly, although we now generally presume that Congress intends its laws to have the same effect on Puerto Rico as they do on any state, that presumption can be overcome by "specific evidence" to the contrary or by "clear policy reasons embedded in" a statute.  Id. at 42; see Jusino Mercado, 214 F.3d at 42 (listing "two possible avenues to differential treatment:  an express direction in the statutory text or some other compelling reason").  Here, the explicit reference to Puerto Rico in the BAA and Congress's decision to retain that reference notwithstanding its recent overhaul of the statute are overwhelming and express evidence that Congress intends the BAA to apply to the Commonwealth even though it does not apply to any of the fifty states.

In an effort to blunt the force of this reasoning, the appellants note that a 1988 amendment to the BAA added several references to "Federal agenc[ies]." See Act of Aug. 23, 1988, Pub. L. No. 100-418, §§ 7002, 7005, 102 Stat. 1107.  They assert that this amendment demonstrates that the BAA applies only to the federal government, not to the autonomous government of Puerto Rico.  But the 1988 amendment did not eliminate the BAA's explicit reference to Puerto Rico and, in all events, that amendment ceased to be effective on April 30, 1996.  See id. § 7004.

We also reject the appellants' asseveration that the BAA's inclusion of Puerto Rico was impliedly repealed when Congress passed the FRA.  It is a "cardinal rule . . . that repeals by implication are not favored." Morton v. Mancari, 417 U.S. 535, 549

(1974) (quotation marks omitted). Implied repeal occurs only where two acts are in irreconcilable conflict or when a later act "covers the whole subject of the earlier one and is clearly intended as a substitute." Posadas v. Nat'l City Bank of N.Y., 296 U.S. 497, 503 (1936).

Here, there is no basis for arguing that the FRA was intended to replace the BAA (and, indeed, the appellants abjure any such argument). What is more, the BAA and the FRA coexist in perfect harmony. It is beyond hope of contradiction that the FRA permits Congress to treat Puerto Rico differently from the states. See Jusino Mercado, 214 F.3d at 40; Cordova, 649 F.2d at 42. The BAA does exactly that, imposing unique procurement restraints on the Commonwealth's government. There is simply no conflict between the FRA's granting of autonomy to Puerto Rico and the BAA's imposition of rules applicable to the Commonwealth. Moreover, even if the BAA and FRA were in irreconcilable conflict, the BAA holds the trump card. After all, Congress re-enacted the BAA in 2011, making it the more recent expression of Congress's intent. See Pub. L. No. 111-350.

We are also unpersuaded by the appellants' reliance on 48 U.S.C. § 734, which states that: "The statutory laws of the United States not locally inapplicable . . . shall have the same force and effect in Puerto Rico as in the United States . . . ." As we have made pellucid, this provision is without force where Congress intends to treat Puerto Rico differently from the states. See

-19-

Jusino Mercado, 214 F.3d at 42. By expressly including "Puerto Rico" among the entities enumerated in the BAA, Congress plainly intended the law to apply to the Commonwealth even though it does not apply to the states.

Equally misplaced is the appellants' reliance on the 1950 Act of Congress that granted Puerto Rico the right to ratify a constitution. Section 6 of that Act states that "All laws or parts of laws inconsistent with this Act are hereby repealed." FRA, § 6, 64 Stat. at 320. We see nothing "inconsistent" between the BAA and the 1950 Act. Congress is permitted to treat Puerto Rico differently despite its state-like status, Jusino Mercado, 214 F.3d at 42, and the BAA is merely an instance of Congress exercising that prerogative.[4]

To say more on this point would be supererogatory. We conclude that the BAA by its express terms imposes restrictions on public construction projects undertaken by the Commonwealth of Puerto Rico. But this conclusion, in and of itself, does not resolve the preemption inquiry. We turn next to the preemptive effect, if any, of the BAA on the local laws at issue here.

It is a matter of bedrock that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the

---

[4]At any rate, the 1950 Act repealed only "inconsistent" laws then in existence; it has no effect on Congress's 2011 re-enactment of the BAA.

Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; see M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments . . . ."). Consequently, state laws that "interfere with, or are contrary to the laws of Congress" are void ab initio. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211 (1824); see Free v. Bland, 369 U.S. 663, 666 (1962) (stating that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield"). For preemption purposes, the laws of Puerto Rico are the functional equivalent of state laws. See P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 499 (1988).

In determining the preemptive effect of a federal law, we must look to the intent of Congress. Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008). We begin with the presumption that a federal act does not preempt an otherwise valid state law, and we set aside that postulate only in the face of clear and contrary congressional intent. City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 432 (2002). In some instances, that intent can appear haec verba on the face of a statute. See, e.g., Sprietsma v. Mercury Marine, 537 U.S. 51, 58-59 (2002). In the absence of express language, however, we must look to the structure and purpose of the statute. See Barnett Bank of Marion Cnty., N.A.

v. Nelson, 517 U.S. 25, 31 (1996).  For example, we can infer Congress's intent to preempt an entire field of law when it enacts a scheme of regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).  By like token, when a state law directly conflicts with a federal statute — such as where it is "physically impossible" to comply with both laws or "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress" — we can presume that Congress intended preemption to occur.  La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368-69 (1986).

No express language in the BAA evinces an intent to preempt state law.  Nor can we perceive any field that Congress attempted to occupy through the enactment of the BAA.

To be sure, Antilles proposes that Congress intended by means of the BAA to exercise full dominion over "the field of acquisitions of foreign products, insofar as Puerto Rico and the other territories of the United States are concerned."  Appellee's Br. at 33.  There are two problems with this concept.  First, the BAA is the only federal statute that purposes to regulate Puerto Rico's acquisitions of foreign products, and its scope is hardly pervasive.  Second, there is a strong presumption that Congress does not intend to preempt a field traditionally occupied by the states unless Congress makes such an intention "clear and manifest."  Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,

-22-

471 U.S. 707, 715 (1985). Puerto Rico's ability to spend its money as it chooses is a basic aspect of its autonomy, and we cannot believe that Congress intended to commandeer Puerto Rico's spending power insofar as it relates to foreign products without making that intent clear.

Antilles suggests that Congress demonstrated its intent to preempt Puerto Rico's procurement policies by enacting the BAA. But this is little more than a tautology, and the Supreme Court has cautioned against the tautological inference that whenever the federal government steps into a field, its regulations will be exclusive. See id. at 717. The Court added that "[s]uch a rule . . . would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence." Id. Consistent with this guidance, we conclude that the mere fact that Congress enacted the BAA is not enough to evince a manifest intent to preempt all Puerto Rico laws relating to the Commonwealth's purchase of foreign products.

Having determined that the BAA neither expressly preempts Laws 109 and 132 nor preempts the field in which those statutes operate, we are left with the question of whether there is any irreconcilable conflict between the BAA and those laws. We undertake this inquiry mindful that a state law must yield to a federal law "when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives." Grant's

-23-

<u>Dairy-Me., LLC</u> v. <u>Comm'r of Me. Dep't of Agric., Food & Rural Res.</u>, 232 F.3d 8, 15 (1st Cir. 2000).

It is surely possible to comply simultaneously with both the BAA and the challenged Puerto Rico statutes. Laws 109 and 132 stiffen, but do not contradict, the protectionist requirements of the BAA. A few examples will serve to illustrate this point.

Under the BAA, Puerto Rico must purchase domestic materials for use in public construction projects unless the cost of comparable foreign materials would be at least six percent lower. <u>See</u> 48 C.F.R. § 25.204(b). Law 109, however, demands adherence to the domestic preference unless the foreign product is at least fifteen percent cheaper. <u>See</u> <u>Antilles II</u>, 408 F.3d at 44. Similarly, the BAA's domestic preference requirement can be waived if a department head determines that it is not in the "public interest." 41 U.S.C. §§ 8302(a)(1); 8303(b)(3). Law 109 eviscerates this exemption. Up and down the line, Law 109 imposes more severe obstacles to the Commonwealth's ability to purchase foreign goods than does the BAA. It follows that if the Commonwealth is in compliance with Law 109, then it by definition has satisfied the BAA's more relaxed standards. After all, the greater necessarily includes the lesser.

The district court implicitly agreed that it is possible to comply with both the BAA and the challenged statutes. It nonetheless found that the former preempted the latter because Laws 109 and 132 undercut Congress's aims. We are not persuaded.

-24-

There is nothing unusual about a state supplementing a federal statute with stronger regulations. See, e.g., Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 41 (1st Cir. 2006). By legislating in an area, Congress generally does "not mean that States and localities [are] barred from . . . imposing further requirements in the field." Hillsborough Cnty., 471 U.S. at 717. Thus, courts routinely have upheld state statutes that impose tougher restrictions than their federal counterparts as long as the state law does not undermine the purposes of the federal statute. See, e.g., Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 288-92 (1987); Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 372 n.3 (1st Cir. 1980), abrogated on other grounds, Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992). Conversely, state statutes that flatly contradict policies embedded in a federal statute are preempted. See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 159-60 (1989).

Among other things, then, determining whether state and federal statutes can coexist requires us to consider the extent to which their policy aims are harmonious. See United States v. Locke, 529 U.S. 89, 108 (2000). The core policy of the BAA is the protection of American industry (and, by extension, the American worker) from foreign competition. See Rule Indus., 878 F.2d at 538; Allis-Chalmers Corp., Hydro-Turbine Div. v. Friedkin, 635 F.2d 248, 257 (3d Cir. 1980); see also 76 Cong. Rec. 1893 (statement of Rep. Riley J. Wilson) (explaining, in his role as the BAA's

-25-

principal sponsor, that "the purpose of this bill is to establish a policy by the Government assuring the use of American materials for the execution and carrying on of public works in every place where the United States has jurisdiction"); 155 Cong. Rec. *S13321, *S13322 (statement of Sen. Russ Feingold) (noting that the name of the BAA "accurately describes its purpose: to ensure that the Federal Government supports domestic companies and domestic workers by buying American-made goods"). Laws 109 and 132, which are protectionist in nature, comport perfectly with that policy.

Of course, the BAA makes some exceptions to its essentially protectionist regime, and the Executive Branch has sometimes blunted its thrust. See, e.g., Exec. Order No. 10582, 19 Fed. Reg. 8723 (Dec. 17, 1954). But that nibbling around the edges does not mean, as Antilles would have it, that the BAA embodies a federal policy of "allow[ing] a reasonable flux of foreign commerce." Appellee's Br. at 36. The fact that either Congress or the Executive Branch has determined, in particular circumstances, that a covered entity is not bound by the BAA's strictures does not show that the BAA manifests any type of pro-trade policy; those exceptions merely recognize that the BAA's protectionist regime may be impracticable in some situations. Indeed, if the BAA were concerned with encouraging international trade, then we would expect a covered entity to be required to purchase foreign goods when a BAA exception applies. But that is not the case. The BAA simply gives covered entities the option to buy foreign goods in

-26-

certain circumstances, but it never demands engagement in foreign commerce. See, e.g., 41 U.S.C. §§ 8302(a)(1)-(2); 8303(b) (limning situations where "Buy American" requirement does not apply); 48 C.F.R. § 25.204(b) (expressly permitting covered entity to ignore cost exception to BAA).

The district court found that Law 109 contravenes the BAA's policy of encouraging "flexibility" in procurement decisions. Leaving to one side whether "flexibility" is a "policy" indulging the BAA, Law 109 strikes us as a manifestation of the flexibility contemplated by the statute. The BAA sets a floor of protectionism — not a ceiling. It then invites the covered entities to build upon that floor. For example, the BAA requires a covered entity to procure domestic materials as long as their foreign counterparts are not more than six percent cheaper; but the covered entity, if it so chooses, can require a higher price discrepancy before it looks overseas. See 48 C.F.R. § 25.204(b). By enacting Law 109, Puerto Rico — as explicitly permitted by the BAA — has raised from six to fifteen percent the price discrepancy that must exist before the Commonwealth will purchase foreign materials. In doing so, Puerto Rico has simply built upon the BAA's floor of protectionism. See Atherton v. FDIC, 519 U.S. 213, 227 (1997) (finding no preemption where federal statute "provides only a floor" that "does not stand in the way of a stricter standard that the laws of some States provide").

A second example may also prove helpful. The BAA confers upon a covered entity the option — but not the obligation — to buy foreign goods if it determines that doing so would be in the public interest. See 41 U.S.C. §§ 8302(a)(1); 8303(b)(3). In Law 109, Puerto Rico has declared its belief that purchasing foreign goods for its own public works is never in the public interest. So viewed, to the extent that the BAA embodies a policy of providing covered entities with flexibility in procurement decisions, Law 109 is merely an outgrowth of that policy. We find no conflict and, therefore, no preemption.[5]

### B. **Dormant Foreign Commerce Clause**.

Our conclusion that the BAA does not preempt Laws 109 and 132 brings us to the question of whether the challenged statutes violate the dormant Foreign Commerce Clause. In our federal system, Congress is imbued with the sole power "[t]o regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. There are two sides to the Commerce Clause coin: the Clause not only gives Congress the express power to regulate commerce but also implicitly protects against state laws inimical to foreign or national trade. Barclays Bank PLC v. Franchise Tax Bd. of Cal., 512 U.S. 298, 310-11 (1994).

---

[5]We need not address the suggestion that Laws 109 and 132 undermine the BAA's exemption for certain purchases made pursuant to reciprocal defense procurement agreements. See 41 U.S.C. § 8304. This exemption applies only to military procurements and is unaffected by the challenged Puerto Rico statutes.

In other words, "[a]lthough the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984).

In the case at bar, Antilles insists that Laws 109 and 132 impermissibly infringe upon Congress's constitutional prerogative to regulate trade with foreign nations and thus violate the dormant aspect of the Foreign Commerce Clause. This argument is difficult to unpack because the Supreme Court has had few occasions to offer guidance regarding the contours of the dormant Foreign Commerce Clause. See Antilles II, 408 F.3d at 46. Each of these few instances involved the inapposite issue of state taxation of foreign commerce. See id. (collecting cases). Even so, there are principles that can be gleaned from cases discussing a closely related concept: the dormant Interstate Commerce Clause. See id. ("Although the language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce.").

To begin, those cases make it clear that Puerto Rico is subject to the strictures of the dormant Commerce Clause in regard to both interstate and foreign commerce. See Trailer Marine Transp. Corp. v. Rivera Vazquez, 977 F.2d 1, 6-9 (1st Cir. 1992). Like a state, therefore, Puerto Rico generally may not enact

-29-

policies that discriminate against out-of-state commerce.  See, e.g., Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008). But like any state, Puerto Rico is unchained from the shackles of the Commerce Clause when it acts as a participant in the free market as opposed to a sovereign regulating the market.  See White v. Mass. Council of Constr. Emp'rs, Inc., 460 U.S. 204, 208 (1983) (holding that "when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"); Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980) (finding "no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market").  For example, when a state sells cement from a factory that it owns, it is free to sell exclusively to in-state customers. See Reeves, 447 U.S. at 440.  Similarly, a state acting as a buyer in a particular market may discriminate in favor of in-state sellers.  See Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 808-09 (1976).  Conversely, when a state is acting as a regulator rather than as a market participant, it cannot institute discriminatory policies.  See, e.g., New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 277-78 (1988).

It cannot be gainsaid that Laws 109 and 132 discriminate against products that are produced outside Puerto Rico.  The constitutionality of these laws therefore turns on whether Puerto Rico acts as a market participant or a market regulator when it enforces them.

Before we proceed further, we must add a coda. To date, the market participant exception has been recognized by the Supreme Court only in cases implicating the dormant Interstate Commerce Clause. The Court has not said one way or the other whether the exception applies in cases — like this one — in which a state law is challenged under the Foreign Commerce Clause. See Reeves, 447 U.S. at 437 n.9. There is some reason to believe that the market participant exception might be inapplicable to state laws that discriminate against foreign commerce. The need for national uniformity in foreign affairs is important, see Wardair Can., Inc. v. Fla. Dep't of Revenue, 477 U.S. 1, 8 (1986), and therefore state laws that burden foreign trade necessarily deserve closer scrutiny than those that burden only interstate commerce, see Barclays, 512 U.S. at 311. Put another way, the dormant Foreign Commerce Clause places stricter constraints on states than its interstate counterpart. See Japan Line, Ltd. v. Cnty. of L.A., 441 U.S. 434, 448 (1979) ("Although the [Commerce Clause] grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.").

The issue of whether the market participant exception can save state laws that discriminate against foreign commerce is one of first impression for this court. See Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 65-66 (1st Cir. 1999) (leaving

question open), aff'd on other grounds sub nom. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000). After careful consideration, we hold that a state may discriminate against foreign commerce when it participates in the free market. Accord Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903, 910-12 (3d Cir. 1990); K.S.B. Technical Sales Corp. v. N. Jersey Dist. Water Supply Comm'n of N.J., 381 A.2d 774, 787 (N.J. 1977).

Our conclusion is justified by the Supreme Court's oft-repeated mantra that a state, when acting as a market participant, is not "subject to the limitations of the negative Commerce Clause." Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 592 (1997). Even though the Court once expressly reserved judgment on whether this principle applies to the negative Foreign Commerce Clause, see Reeves, 447 U.S. at 437 n.9 (dictum), it has not otherwise suggested that the market participant exception is limited to interstate commerce. To the contrary, the Court has frequently employed sweeping language to the effect that the Commerce Clause in its entirety does not apply to market participants. See, e.g., Camps Newfound, 520 U.S. at 592-93; New Energy, 486 U.S. at 277; S.-Cent. Timber, 467 U.S. at 94; White, 460 U.S. at 208, 210; Alexandria Scrap, 426 U.S. at 810.

Furthermore, extending the market participant exception to the context of foreign commerce is consistent with the purposes undergirding the exemption. As the Court has explained, the exception recognizes that a state that delves into the free market

-32-

is akin to a private business — and the law has long respected the unfettered discretion of private businesses to deal with whomever they please. See Reeves, 447 U.S. at 438-39; see also S.-Cent. Timber, 467 U.S. at 94 (concluding that "the Commerce Clause places no limitations on a State's refusal to deal with particular parties when it is participating in the interstate market in goods"). This makes perfect sense. After all, a state that participates in the market is burdened by the same regulations as private companies. Reeves, 447 U.S. at 439. To ensure a level playing field, "when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." Id. While these principles have been developed in the interstate commerce context, they apply with equal force when a state-proprietor discriminates against foreign commerce. Private businesses are permitted to refuse to deal with foreign companies, and so states, acting as market participants, deserve the same leeway.

A contrary rule would lead to anomalous results. Indeed, any law that discriminates against out-of-state companies necessarily impedes both interstate and foreign commerce. The Supreme Court has repeatedly relied on the market participant doctrine to uphold discriminatory laws against Commerce Clause challenges with respect to interstate commerce. If the market participant exception cannot also excuse barriers to foreign trade, however, then all of these laws would be suspect and the Supreme

-33-

Court's forging of the market participant doctrine would have been little more than an exercise in futility.

At bottom, we can see no reason why a state participating in the market should not be permitted to choose with whom it does business. The dormant Foreign Commerce Clause exists to ensure that the United States speaks with a unified voice when it engages in foreign trade. Wardair, 477 U.S. at 8; Japan Line, 441 U.S. at 448-51. A particular state's refusal, as a market participant, to transact business with a foreign company does not undermine the cohesiveness of our national trade policy; it merely removes one entry from the foreign company's customer list. Indeed, given that the federal government has adopted a protectionist posture regarding its own public procurements, it can even be argued that a state Buy American statute — such as Law 109 — actually fosters more uniformity in our trade policy.

Some commentators have expressed concern that foreign countries will view a state-proprietor's decision not to do business with them as a trade barrier erected by the United States and will seek to retaliate against the nation as whole. See Natsios, 181 F.3d at 66. But this fear makes sense only when discussing state regulations that burden trade between foreign companies and private entities within that state. If such laws were permitted, foreign countries would face a confusing array of protectionist state regulations and, as a result, might either eschew trade with the United States or erect their own barriers to

American products.  But when a state-proprietor chooses to transact business with only domestic entities, foreign companies face "no problems of reconciling conflicting policy among multiple national sovereigns."  Trojan Techs., 916 F.2d at 912.  The companies can still do business anywhere in the United States under the same terms; they simply cannot contract with the government of the state that enacted the protectionist statute.

To sum up, we hold that a state cannot violate the dormant Foreign Commerce Clause when acting as a market participant.  This holding applies equally to Puerto Rico.

But this conclusion does not end our odyssey.  The question remains whether Puerto Rico acts as a market participant or a market regulator when enforcing Laws 109 and 132.

In order to qualify for the prophylaxis of the market participant doctrine, a state must be acting as a private company would act, not "in its distinctive governmental capacity."  New Energy Co., 486 U.S. at 277.  Conversely, when a state flexes its sovereign muscle to regulate the behavior of other players in the market, the market participant exception does not apply.  See, e.g., id. at 277-78.

We add, moreover, that a state-proprietor may discriminate against foreign commerce only within the narrow market realm in which it operates.  See S.-Cent. Timber, 467 U.S. at 99 (holding that a state "may not avail itself of the

market-participant doctrine to immunize its downstream regulation of [a] market in which it is not a participant").

We turn from the general to the specific. Law 109 states (with exceptions not relevant here) that when the Commonwealth either uses public funds to hire a contractor or engages in construction work itself, the materials used in the construction must originate from Puerto Rico. See P.R. Laws Ann. tit. 3, §§ 927a-927c. These provisions do not implicate the Commerce Clause. When the Commonwealth uses its own funds to undertake a construction project, it is acting as a buyer in the market for construction services. Cf. Alexandria Scrap, 426 U.S. at 808-10 (holding that state acting as a buyer of scrap metal is a market participant). Because it is a market participant, the Commonwealth is entitled (as any private company would be) to demand contractual conditions that relate directly to the service being purchased. See S.-Cent. Timber, 467 U.S. at 97 (explaining that "market-participant doctrine permits a State to influence 'a discrete, identifiable class of economic activity in which [it] is a major participant'" (quoting White, 460 U.S. at 211 n. 7 (1983))).

This case is unlike South-Central Timber, where the Supreme Court prevented Alaska from imposing downstream restrictions on its customers. Under the invalidated Alaska statute, customers who gathered timber from state land were required to process that timber in Alaska. The Court held that Alaska had no business telling its customers what they could do

with their timber after their transactions with the state were completed.  Id. at 96-99.  The market participant doctrine was inapplicable because Alaska, by regulating behavior that was unrelated to its timber sales transactions, acted more like a sovereign than a private company.  See id. at 99.  Here, by contrast, Puerto Rico has legislated domestic preference requirements that are directly tied to its activities as a participant in the market for construction services.  When the Commonwealth acts as a run-of-the-mill buyer, the market participant doctrine allows it to demand discriminatory concessions that are proximately related to the transactions at issue.

It is important to note that the parties do not challenge the district court's finding that Law 109 has no bearing on private construction projects that are subsidized by the Commonwealth.  If the Commonwealth had been enforcing Law 109 against such private projects, then arguably it would be acting as a market regulator, and the outcome of this appeal might be different.

We are unconvinced by Antilles's attempts to characterize Law 109 as a market regulation.  It first points to the law's enforcement mechanism, which provides the Commonwealth with greater recourse against a contractor who violates Law 109 than a private party would have against a breaching counterparty under general law.  See P.R. Laws Ann. tit. 3, §§ 927f-927g.  By including these "punitive" measures, Antilles says, the Commonwealth is regulating its contractors as a sovereign would.  This line of reasoning goes

nowhere because a private party could easily insert similar enforcement mechanisms in a private construction contract. The Commonwealth has merely codified in legislation the sort of concessions that a private business could codify in an agreement, and doing so does not divest Puerto Rico of market participant status.

Antilles next contends that Law 109 essentially regulates the entire construction industry because it restrains the various subcontractors who work on large government projects. We are not prepared to take such a leap. Law 109 regulates subcontractors only to the extent that they are providing a service to the Commonwealth. And, as we have already established, the Commonwealth is permitted to place protectionist demands on its service providers when it participates as a buyer in the marketplace.

That ends this aspect of the matter. We conclude that Law 109 is shielded from Commerce Clause scrutiny by the market participant doctrine.

This leaves only Law 132, which requires companies that sell cement in Puerto Rico to place certain labels on their products. See P.R. Laws Ann. tit. 10, § 167e. That law is quite clearly an attempt to regulate the cement market.

The Commonwealth does not participate in the cement market. Rather, it has by means of Law 132 imposed labeling regulations that affect transactions between its citizens and

private companies. That is the essence of acting as a market regulator. See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 80 (1st Cir. 2001).

Where, as here, the market participant exception does not apply and where Congress has not spoken otherwise, state laws that on their face discriminate against foreign commerce are almost always invalid. See Fulton Corp. v. Faulkner, 516 U.S. 325, 331 (1996). Law 132 is such a law: it requires companies that sell foreign cement to place a different label on their products than companies that sell domestic cement. See P.R. Laws Ann. tit. 10, § 167e(a)(4). The record adequately evinces that this discriminatory labeling requirement has placed the sellers of foreign cement at a competitive disadvantage. Law 132 can thus survive only if the Commonwealth can show that the law advances a legitimate local goal that could not have been served as well by nondiscriminatory means. See Maine v. Taylor, 477 U.S. 131, 138 (1986).

The Commonwealth has not made such a showing here. The purported justification for Law 132 - insuring that contractors comply with the BAA and Law 109 - can easily be accomplished by less discriminatory means. For example, the Commonwealth could maintain a database of companies that sell qualified cement and

share that information with contractors who work on projects covered by the BAA and Law 109.[6]

We hold, therefore, that, to the extent that Law 132 discriminates against sellers of foreign cement, it contravenes the Foreign Commerce Clause. Withal, we leave intact the labeling requirements of Law 132 that apply evenhandedly to sellers of foreign and domestic cement. See Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 328-29 (2006) ("We prefer . . . to sever [a statute's] problematic portions while leaving the remainder intact.").

## IV. CONCLUSION

To recapitulate, we uphold Law 109 as a permissible action taken by Puerto Rico in its capacity as a market participant, but we strike down those provisions of Law 132 that discriminate against sellers of foreign cement (leaving the remainder of that law intact).

**Affirmed in part, reversed in part. All parties shall bear their own costs.**

---

[6]Indeed, it appears that the Commonwealth already maintains precisely this type of database. See P.R. Laws Ann. tit. 3, § 927d.