## UNITED STATES *v.* BEACH.

No. 620.   Argued February 9, 1945.—Decided February 26, 1945.

*Mr. Robert L. Stern,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark, Messrs. Robert S. Erdahl, Irving S. Shapiro* and *W. Marvin Smith* were on the brief, for the United States.

*Mr. James R. Kirkland,* with whom *Mr. Nathan M. Lubar* was on the brief, for respondent.

PER CURIAM.

Respondent was indicted and convicted upon a jury trial, in the District Court of the United States for the District of Columbia, of transporting another woman in Washington, D. C., for the purpose of prostitution, in violation of the Mann Act. 36 Stat. 825, 18 U. S. C. § 397, *et seq.* Section 2, 18 U. S. C. § 398, makes it a penal offense knowingly to "transport or cause to be trans-

ported, or aid or assist in obtaining transportation for, or in transporting, in interstate . . . commerce, or . . . in the District of Columbia, any woman . . . for the purpose of prostitution . . . or with the intent and purpose to induce, entice, or compel such woman . . . to give herself up to debauchery, or to engage in any other immoral practice . . ." The prohibited transportation with the intent or purpose to induce or entice the woman transported to practice prostitution violates the statute. *Hoke* v. *United States,* 227 U. S. 308; *Athanasaw* v. *United States,* 227 U. S. 326; *Harris* v. *United States,* 227 U. S. 340, 341; *Wilson* v. *United States,* 232 U. S. 563, 571; cf. *Mortensen* v. *United States,* 322 U. S. 369, 374.

The Court of Appeals for the District set aside the conviction on the ground that the Mann Act was inapplicable to transportation taking place wholly within the District. 144 F. 2d 533. That court found support for its conclusion in the numerous acts of Congress enacting local laws for the District, which make it a criminal offense for "any prostitute" to invite or persuade any person to go with her to any building for the purpose of prostitution, or for any person to entice or force any woman to go to a house of assignation, or for any person to invite, induce, or procure another to engage in prostitution or to go to any place for purposes of prostitution.[1] The court thought that the addition of the prohibition of the Mann Act to this legislation, specifically applicable only in the District, was so useless and unnecessary as to indicate that the Mann Act was not designed to apply to the District of Columbia "except in its interstate aspect." No other question was considered or decided below or discussed in the briefs and argument of counsel here, and we decide no other.

---

[1] D. C. Code (1929) Tit. 6, §§ 177, 179; D. C. Code (1940) §§ 22–2701, 22–2702, 22–2705 to 22–2712.

But none of these enactments of local application speak of "transportation" for immoral purposes, which is the act condemned by the Mann Act. The Mann Act not only penalizes such transportation in interstate commerce, which is defined in § 1, 18 U. S. C. § 397, as including any commerce into or out of the District, but it specifically and repeatedly includes in its prohibition, such transportation "in any territory or the District of Columbia." Congress, in enacting the Mann Act, made it perfectly plain by its Committee Reports on the proposed legislation that it was intended to apply to transportation taking place wholly within the District of Columbia. H. Rep. No. 47, 61st Cong., 2d Sess., p. 2; S. Rep. No. 886, 61st Cong., 2d Sess., p. 2. Both Reports declare: "All of the provisions which make the crime depend upon transportation in interstate or foreign commerce are made applicable to the District of Columbia, the Territories and possessions of the United States, including the Panama Canal Zone, without regard to the crossing of district, territorial, or state lines . . ." This was recognized both by the proponents and by the opponents of the bill on the floor of the House. 45 Cong. Rec. 812–813, 816; 45 Cong. Rec. App. 14. (The point was not debated in the Senate.) Congress thus, through the exercise of its police power over the District, followed its usual policy of extending legislation based on the commerce power to the same substantive acts taking place wholly within the District.[2]

Whether the District was already adequately protected from the evils of prostitution without the added prohibition of transportation for that purpose, was for Congress, not the courts, to decide. The prohibition was deliber-

---

[2] See, for example, the Sherman Act (15 U. S. C. § 12), the Federal Trade Commission Act (15 U. S. C. § 44), the Federal Denture Act (18 U. S. C. Supp. III, 1943, § 420g), the Anti-Racketeering Act (18 U. S. C. § 420b), and the Food, Drug, and Cosmetic Act (21 U. S. C. § 16).

ately adopted by Congress, and it conflicts with no other legislation applicable in the District. Hence the present reversal of the conviction for its violation was erroneous.

As the Court of Appeals did not pass upon other grounds for reversal urged by respondent, the case is remanded to it for further proceedings not inconsistent with this opinion. *Bates* v. *United States,* 323 U. S. 15, 17, and cases cited.

*Reversed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE MURPHY, dissenting.

We are dealing here with a statute known and referred to by Congress in § 8 as the "White-slave traffic Act." 36 Stat. 825, 827. The Congressional debates and committee reports on the legislation make it plain that the Act was designed and intended solely to prevent "white-slave" traffic and that it should not be applied to the situation present in this case. See 45 Cong. Rec. 805, 821, 1035, 1037; H. Rep. No. 47, 61st Cong., 2d Sess.; S. Rep. No. 886, 61st Cong., 2d Sess.

Prior to the passage of the Act in 1910, numerous investigations had disclosed the existence of a systematic, continuous international and interstate traffic in women and girls, who were being forced against their will to practice prostitution.[1] Fraud, trickery, deceit, force and

---

[1] "The testimony which has been collected, including correspondence and other documentary evidence, which was captured at the time of the arrest of certain notorious criminals, clearly reveals that an organized society exists both in this country, and abroad, formed for no other purpose than to exploit innocent girls for immoral purposes. This syndicate has headquarters, and distributing centers, in New York, Chicago, San Francisco, Denver, and many other American cities, extending even as far north as Nome in Alaska. From the data accumulated by the government agents, it appears that

liquor were used by panderers and procurers to force them into lives of shameless, immoral and involuntary servitude. Many men earned their livelihood from the sale and exploitation of these women. State laws were found entirely inadequate to cope with such an extensive international and interstate traffic.

Congress, however, was careful to distinguish this vicious traffic from immorality and prostitution in general. It made it clear that the Act was aimed solely at the white-slave traffic, which was explicitly defined as "the business of securing white women and girls and of selling them outright, or of exploiting them for immoral purposes." H. Rep. No. 47, p. 11; S. Rep. No. 886, p. 11. It was pointed out that "the women who are the victims of the traffic are unwillingly forced to practice prostitution" and that "these women are practically slaves in the true sense of the word; that many of them are kept in houses of ill fame against their will; and that force, if necessary, is used to deprive them of their liberty." H. Rep. No. 47, p. 10; S. Rep. No. 886, p. 11. "The term 'white slave' includes only those women and girls who are literally slaves—those women who are owned and held as property and chattels—whose lives are lives of involuntary servitude; those who practice prostitution as a result of the activities of the procurer, and who, for a considerable period at least, continue to lead their degraded lives because of the power exercised over them by their owners." H. Rep. No. 47, pp. 10, 11; S. Rep. No. 886, p. 11.[2] At the same time, the Congressional committees were careful to explain that there was no attempt, by invading the prov-

within the last ten years, hundreds of girls have been transferred to various portions of the United States, through the pernicious activities of the agents of this syndicate." 45 Cong. Rec. 1037.

[2] Webster's New International Dictionary, 2d Ed., defines "white slave" as "a woman held unwillingly for purposes of commercial prostitution."

ince of the states, to suppress or regulate immorality in general or "to regulate the practice of voluntary prostitution." No effort was made to prohibit or punish the practice of prostitution or the keeping of houses of ill fame. These matters were recognized to be within the proper and exclusive domain of state law. H. Rep. No. 47, pp. 1, 2.

This rich background of Congressional intent and the clear and obvious title of the Act give meaning and boundaries to the broad language used in the statute. It was the pernicious white-slave traffic that Congress had in mind when it provided in § 2, under which respondent was convicted, for the punishment of any person transporting in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prostitution, debauchery or any other immoral purpose. That courts in the past have ignored the plain Congressional purpose and have applied these statutory words in a literal sense, so as to punish anyone transporting a woman for immoral purposes quite apart from any connection with white-slavery, does not command us to continue such an erroneous construction and application of the Act.

Therefore I agree with the Court to the extent that its judgment means that the Act applies to white-slave traffic solely within the District of Columbia, a result required by the words of the statute and by the Congressional history. But the application of the Act to transportation solely within the District of Columbia for purposes quite unrelated to white-slavery should not be sanctioned. The Court does not pass upon that issue directly and, in its discretion, may ignore it. But the facts of this case speak out boldly and cannot be unheeded. To do so is to impose a criminal statute unfairly upon a citizen by disregarding its true intent and purpose, thereby adding another instance of tortured and grotesque application to its already unhappy history.

The evidence here discloses that the respondent operated a dress shop in the city of Washington and employed a girl as an assistant. The girl at the same time began to live with respondent at the latter's apartment. Three days later respondent suggested to the girl that she could earn more money by "selling herself." Although she had never practiced prostitution before, the girl thought it over and finally agreed to work for respondent as a prostitute. The girl practiced prostitution in respondent's apartment and in various hotel rooms to which respondent sent her. On the day in question, respondent accompanied the girl to a hotel some four blocks from the apartment for purposes of prostitution. The trip was made by taxicab, respondent paying her own and the girl's fare. The evidence is clear that the respondent in no way compelled, enticed or induced the girl to engage in the business of prostitution through fraud, deceit or force; it was a purely voluntary matter on the part of the girl.

Thus the Court today applies the White Slave Traffic Act to a case of voluntary prostitution, despite the fact that none of the elements of white-slavery is present. Equally disregarded is the fact that Congress clearly intended such conduct to remain punishable under local laws and that adequate local laws for the District of Columbia have been provided by Congress to cope with the real evils present in this instance. Such facts make it unnecessary to invoke the White Slave Traffic Act as a means of controlling voluntary vice in the District.

The Act is applied here not because white-slavery is present but because acts of voluntary prostitution followed the payment for a four-block taxicab ride, acts which are punishable under local law. Such distortion of the legislative purpose is not required to safeguard sound rules of interpretation. It can only serve to subject residents of the District of Columbia to the evils of blackmail

and persecution and to punish unjustly those whose immoral acts do not constitute white-slavery. No principle of stare decisis and no rule of statute or reason can justify such a result.

MR. JUSTICE BLACK joins in this opinion.