# United States Court of Appeals
## For the First Circuit

No. 15-2145

UNITED STATES OF AMERICA,

Appellant,

v.

EDWIN MALDONADO-BURGOS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Thompson, Dyk,[*] and Kayatta,
Circuit Judges.

John Patrick Taddei, Attorney, Appellate Section, Criminal
Division, United States Department of Justice, with whom Leslie R.
Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy
Assistant Attorney General, Rosa E. Rodríguez-Vélez, United States
Attorney, Nelson J. Perez-Sosa, Assistant United States Attorney,
and Mariana E. Bauza Almonte, Assistant United States Attorney,
were on brief, for appellant.
Eleonora C. Marranzini, Assistant Federal Public Defender,
with whom Eric Alexander Vos, Federal Public Defender, Vivianne M.
Marrero, Assistant Federal Public Defender, Supervisor, Appeals
Section, and Liza L. Rosado-Rodriguez, Research and Writing
Specialist, were on brief, for appellee.

---

[*] Of the Federal Circuit, sitting by designation.

December 21, 2016

**THOMPSON**, **Circuit Judge**. In this appeal, we are tasked with deciding whether 18 U.S.C. § 2421(a) — which prohibits transportation of an individual "in interstate or foreign commerce, or in any Territory or Possession of the United States" for purposes of prostitution or other unlawful sexual activity — applies to transportation that occurs solely within Puerto Rico. Long ago, we answered this question in the affirmative. See Crespo v. United States, 151 F.2d 44, 45 (1st Cir. 1945). In a typical case, this would end our inquiry.

But this case — arising in the wake of Puerto Rico's post-Crespo transformation from a United States territory to the "self-governing Commonwealth" that it is today, Puerto Rico v. Sánchez Valle, 136 S. Ct. 1863, 1874 (2016) — is far from typical. And, despite the government's arguments to the contrary, we conclude that our post-Crespo decision in Cordova & Simonpietri Insurance Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36 (1st Cir. 1981), blazed a trail that we must follow in this case. Applying Cordova's analytical framework, we hold that § 2421(a) does not apply to transportation that occurs solely within Puerto Rico. Accordingly, we affirm the district court's dismissal of the indictment.

**How the Case Got Here**[1]

The two-count indictment in this case alleges that, on two separate occasions, the defendant, Edwin Maldonado-Burgos (Maldonado), transported an eighteen-year-old woman with a severe mental disability within Puerto Rico with the intent to engage in sexual activity that was criminal under Puerto Rico law. Maldonado moved to dismiss the indictment, arguing that transportation occurring solely within Puerto Rico does not violate § 2421(a). The district court agreed and dismissed the indictment. The government timely appealed.[2]

**Setting the Stage**

This case presents us with a question of statutory interpretation, which we review de novo. See United States v. Place, 693 F.3d 219, 227 (1st Cir. 2012). We start with the statutory text. See United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008). Section 2421(a) punishes "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that

---

[1] In this appeal from the district court's dismissal of an indictment, we glean the factual background from the well-pleaded facts in the indictment itself. See United States v. Nippon Paper Indus., 109 F.3d 1, 2 (1st Cir. 1997).

[2] Meanwhile, the Commonwealth of Puerto Rico charged Maldonado in connection with this conduct. At oral argument, his attorney represented to us that Maldonado has since pled guilty to the Puerto Rico charges and was awaiting sentencing as of that date.

such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so."[3]  Because neither § 2421(a) nor any other provision of the Mann Act explicitly mentions Puerto Rico, we are called upon to decide whether Puerto Rico is a "Territory or Possession of the United States" under § 2421(a).

Before tackling the merits of this interpretation controversy, we first briefly recount the evolution of the relationship between the United States and Puerto Rico.[4]  In 1898, following the Spanish-American War, Puerto Rico became a territory of the United States.  Sánchez Valle, 136 S. Ct. at 1868.  Over

---

[3] Congress originally enacted this prohibition as part of the Mann Act on June 25, 1910.  See White-Slave Traffic (Mann) Act, Pub. L. No. 61-277, § 2, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421-2424).  At that time, the Mann Act reached illicit transportation "in interstate or foreign commerce, or in any Territory or in the District of Columbia," id., 36 Stat. at 825, and a different provision provided that "the term 'Territory,' as used in this Act, shall include the district of Alaska, the insular possessions of the United States, and the Canal Zone," id. § 7, 36 Stat. at 827.  In 1948, Congress added the term "Possession," such that the Mann Act covered transportation "in any Territory or Possession of the United States," Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 812 — a phrase that § 2421(a) contains today.  Congress also scrapped the definition of territory in 1948 because it concluded that "[n]o definition of 'Territory' [was] necessary to the revised section as it is phrased."  H.R. No. 80-304, at A150 (1947); see also Pub. L. No. 80-722, 62 Stat. at 812.  Since then, the Mann Act has not defined the terms "Territory" or "Possession."

[4] This brief history lesson is heavily abridged.  For a more robust backstory, we refer the interested reader to our opinion in Cordova, 649 F.2d at 39-41.

- 5 -

the years, Congress gradually increased Puerto Rico's autonomy over its local affairs, id., but "Congress retained major elements of sovereignty" over the island, Cordova, 649 F.2d at 39.

Then, in 1950, Congress passed legislation — which later became part of the Federal Relations Act (FRA), see Act of July 3, 1950, Pub. L. 81-600, § 4, 64 Stat. 319 (codified at 48 U.S.C. §§ 731b-731e) — that authorized the people of Puerto Rico to adopt a constitution. See Sánchez Valle, 136 S. Ct. at 1868; Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero, 426 U.S. 572, 592-94 (1976). Two years later, the Puerto Rico Constitution became law when it received congressional approval. Act of July 3, 1952, Pub. L. No. 82-447, 66 Stat. 327; see Cordova, 649 F.2d at 40. The clear congressional purpose behind "the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." Examining Bd., 426 U.S. at 594. Reflecting this purpose, the Puerto Rico Constitution "created a new political entity, the Commonwealth of Puerto Rico," Sánchez Valle, 136 S. Ct. at 1869 — "a distinctive, indeed exceptional, status," id. at 1874. See id. ("Congress in 1952 'relinquished its control over [the Commonwealth's] local affairs[,] grant[ing] Puerto Rico a measure

of autonomy comparable to that possessed by the States.'" (quoting Examining Bd., 426 U.S. at 597)).[5]

The parties dispute the role that this history should play in our analysis of whether § 2421(a) applies to transportation that occurs wholly within Puerto Rico. We begin by discussing the competing precedent that each side urges is applicable to our analysis.

The government insists that our decision in Crespo controls. In that case, the defendant was charged with violating the predecessor to § 2421(a) by transporting women "from one place to another in Puerto Rico" for purposes of prostitution. Crespo, 151 F.2d at 45. The defendant argued that Congress could not have intended to reach intra-Puerto Rico transportation and thereby "intervene in matters of interest only to the people of Puerto Rico." Id. We disagreed, holding that § 2421(a)'s predecessor "applie[d] to transportation wholly within Puerto Rico." Id. This result, we reasoned, was compelled by both the "express terms" of the statute — which covered "transportation 'in any territory'" — and the clear statement of congressional purpose reflected in the

_____

[5] The events giving rise to this prosecution occurred prior to the enactment of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. §§ 2101-2241, and the government makes no argument that that legislation should bear on our analysis.

- 7 -

committee reports accompanying the passage of the Mann Act, which

provided that the Act was

> applicable to the District of Columbia, the territories
> and possessions of the United States, including the
> Panama Canal Zone, without regard to the crossing of
> district, territorial, or state lines, and appl[ied]
> within the territories to the same extent as [it]
> appl[ied] in cases outside of the territories in
> interstate or foreign commerce.

Id. (quoting S. Rep. No. 61-886, at 2 (1910); H.R. Rep. No. 61-

47, at 2 (1909)).

Maldonado counters that Crespo — which was decided

several years before the adoption of the Puerto Rico Constitution

— does not govern the analysis. Instead, he argues that our later

decision in Cordova sets forth the legal framework that controls

this case. In that case, the plaintiffs were an insurance broker

and its president who arranged the procurement of insurance

policies for automobile dealers in Puerto Rico. Cordova, 649 F.2d

at 37. In an attempt to cut out the middlemen, the insurance

company that issued the policies agreed with a bank that was the

ultimate beneficiary of the policies to cancel the policies and

reissue them without using the plaintiffs' brokerage services.

Id. The plaintiffs responded by filing an antitrust action against

the insurance company and the bank. Id. at 37-38.

On appeal from the dismissal of the plaintiffs'

complaint, we were confronted with the issue of whether, for

purposes of the Sherman Act, we must treat Puerto Rico like a state

- 8 -

or a territory. Id. at 38. The Sherman Act treats territories differently than states: section 3 of that Act reaches agreements "in restraint of trade or commerce in any Territory of the United States," 15 U.S.C. § 3(a); however, the Act's reach is less expansive when it comes to the states, covering only agreements "in restraint of trade or commerce among the several states," id. § 1. See Cordova, 649 F.2d at 36. In 1937, prior to the adoption of the Puerto Rico Constitution, the Supreme Court had held that the term territory in § 3 of the Act did include Puerto Rico. Puerto Rico v. Shell Co., 302 U.S. 253, 259 (1937).

Yet, notwithstanding Shell Co., we held in Cordova that § 3 no longer applied to Puerto Rico. 649 F.2d at 42, 44. In an opinion authored by then-Judge Breyer, we framed the particularized inquiry as follows: "whether the Sherman Act's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act." Id. at 39. And, after reviewing the events culminating in the adoption of the Puerto Rico Constitution and explaining that this history evidenced "a general [c]ongressional intent to grant Puerto Rico state-like autonomy," we announced that, in order for a statute to treat Puerto Rico as a territory after the island adopted its constitution, "there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more

- 9 -

extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." Id. at 42.  Seeing no such evidence or policy reasons, we concluded that "it is fair to assume that the framers of the Sherman Act, had they been aware of the FRA and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a 'state' under the Act, once Commonwealth status was achieved."  Id.

Having sketched the contours of the historical and legal landscape, we now turn to the question of whether § 2421(a) treats Puerto Rico as a state or a territory.

### Analysis

The government argues that Crespo controls this case and that Cordova is inapposite.  As a fallback, it maintains that, even under the Cordova test, Puerto Rico should still be deemed a "Territory or Possession of the United States."  Maldonado, by contrast, argues that the Cordova framework dictates that post-constitutional Puerto Rico be treated like a state for purposes of § 2421(a).

### A.   The Cordova Framework Governs

The government offers several reasons why we need not employ Cordova's analytical framework.  First, it insists that we are bound to follow Crespo and its progeny, Jarabo v. United States, 158 F.2d 509, 511 (1st Cir. 1946), under the law-of-the-circuit doctrine.  To bolster this argument, the government points

- 10 -

us to our decision in United States v. Carrasquillo-Peñaloza, 826 F.3d 590, 591 (1st Cir. 2016), where the defendant argued that the application of 18 U.S.C. § 2423(a), another provision of the Mann Act, "to conduct wholly within Puerto Rico exceeds Congress's legislative authority." Seizing upon our characterization of that argument as "an uphill battle in light of precedent," id. at 592, the government argues that this decision supports its position that "Crespo and its progeny impose . . . an insurmountable obstacle for [Maldonado's] arguments on appeal." We think not.

At the outset, Cordova itself demonstrates that Crespo and its progeny cannot alone carry the day. In Cordova, we were confronted with a pre-1952 decision of the Supreme Court that was directly on point, see Shell Co., 302 U.S. at 259, but we nonetheless proceeded to ask whether the events culminating in the adoption of the Puerto Rico Constitution — events that occurred after Shell Co. was decided — "so change[d] the legal status of Puerto Rico that the Shell decision no longer ha[d] effect." Cordova, 649 F.2d at 39. Likewise, the pre-1952 decisions of this court that the government trumpets do not prohibit us from reexamining the question we decided in Crespo in light of these subsequent events.

The government's reliance on Carrasquillo-Peñaloza is equally misplaced. We held in that case that the defendant "waived her right to bring [her] challenge [to the scope of § 2423(a)]

- 11 -

when she entered an unconditional guilty plea and executed a waiver-of-appeal clause." Carrasquillo-Peñaloza, 826 F.3d at 591. Because of this holding, we expressly declined to reach the merits of her argument. Id. at 592. Thus, our gratuitous characterization of the defendant's argument as "an uphill battle in light of precedent," id., was textbook dictum, see Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992), and we therefore are not bound by it, see United States v. Rodriguez, 630 F.3d 39, 41 (1st Cir. 2010).[6]

The government's second argument relies on Crespo to distinguish Cordova. According to the government, Cordova "turned on" the "[c]ritical" "'fact that, as a general matter, the Sherman Act ceases to apply to purely local matters once territories become states, leaving state governments free to enact various local antitrust laws broadly consistent with general federal policy, but occasionally divergent as to details.'" (Quoting Cordova, 649 F.2d at 41.) The government insists that this critical feature of the Sherman Act is absent from the Mann Act. We know this, the government tells us, because this court in Crespo rejected the defendant's argument that "it could not have been the intent of Congress to intervene in matters of interest only to the people of

_____

[6] In addition, the waived argument in Carrasquillo-Peñaloza concerned Congress's constitutional authority to regulate intra-Puerto Rico conduct. 826 F.3d at 591. In this case, we deal with a very different question of congressional intent.

- 12 -

Puerto Rico, that is to say, regulating immorality in general which is within the proper and exclusive domain of the legislature of Puerto Rico."  151 F.2d at 45.  We are not persuaded.

For one thing, the Sherman Act and the Mann Act are similar — not different — with respect to Congress's hesitancy to intervene in the local affairs of a state:  both statutes reach activity that occurs wholly within a territory, see 15 U.S.C. § 3(a); 18 U.S.C. § 2421(a), while simultaneously reaching state conduct only when it occurs "among the several States," 15 U.S.C. § 1, or "in interstate or foreign commerce," 18 U.S.C. § 2421(a). Thus, the sentence from Cordova on which the government so heavily relies merely explains how a territory's achievement of statehood affects application of the Sherman Act.  Indeed, in support of this passage, Cordova cited Moore v. United States, 85 F. 465 (8th Cir. 1898), which dealt with that exact scenario.  See Cordova, 649 F.2d at 41 n.29.  In Moore, the court held that an indictment alleging a violation of the predecessor to § 3 of the Sherman Act with respect to an agreement in restraint of trade in the then-territory of Utah had no continued effect once Utah achieved statehood because § 3 no longer applied to Utah after that point. 85 F. at 467-68.  The same is true in the Mann Act context.  For example, the Act was understood to reach transportation that occurred solely within Hawaii when it was a territory.  See Lee v. United States, 125 F.2d 95, 96 (9th Cir. 1942).  Once Hawaii

- 13 -

achieved statehood, however, that same conduct could no longer violate the Mann Act.

For another thing, the government overstates the significance of our characterization of the Sherman Act to our holding in Cordova.  It was not "[c]ritical" to our decision.  Instead, the critical fact in Cordova was the absence of "specific evidence or clear policy reasons embedded in [the Sherman Act] to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state."  649 F.2d at 42.  Only in the absence of such evidence could we conclude that "it is fair to assume that the framers of the Sherman Act, had they been aware of the FRA and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a 'state' under the [Sherman] Act, once Commonwealth status was achieved."  Id.

In its third attempt to avoid Cordova, the government cites Sánchez Valle in support of the position that "Puerto Rico remains a territory under the U.S. Constitution," such that Crespo remains controlling.  But neither Sánchez Valle nor Puerto Rico's status under the Constitution forecloses application of the Cordova framework.  In Sánchez Valle, the Supreme Court took pains to acknowledge the "distinctive, indeed exceptional, status as a self-governing Commonwealth" that Puerto Rico occupies today, but the issue presented in that case — whether Puerto Rico and the

- 14 -

United States are different sovereigns for purposes of the dual-sovereignty doctrine — compelled the Court to look not to the present but to the distant past to ascertain "the 'ultimate source' of Puerto Rico's prosecutorial power." 136 S. Ct. at 1874 (quoting United States v. Wheeler, 435 U.S. 313, 320 (1978)); see also id. at 1876. And, although we recently reiterated that Puerto Rico "is 'constitutionally a territory,'" Franklin Cal. Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 344 (1st Cir. 2015) (quoting United States v. Lopez Andino, 831 F.2d 1164, 1172 (1st Cir. 1987) (Torruella, J., concurring)), that observation is beside the point. This case requires us to answer a question of congressional intent, see Cordova, 649 F.2d at 39, not one of the constitutional relationship between Puerto Rico and the United States. See Jusino Mercado v. Puerto Rico, 214 F.3d 34, 40-44 (1st Cir. 2000) (acknowledging Congress's constitutional authority to legislate for Puerto Rico differently than for the states but nonetheless applying the Cordova framework to the question of whether Congress intended a particular statute to treat Puerto Rico as a state or a territory).

Undeterred, the government offers a fourth and final variant of the Crespo-is-controlling argument. This version is multifaceted. Here's how it works: (1) Crespo held that § 2421(a) applies to transportation that occurs solely within Puerto Rico. (2) The FRA's savings clause, 48 U.S.C. § 734, (in the government's

- 15 -

words) "gives rise to a presumption that [a pre-1952] statute continues to apply to Puerto Rico in exactly the same way it did before 1952, unless or until Congress demonstrates the intent to change the statute's application." (3) The wicked one-two punch of Crespo's holding and § 734's presumption preserving that holding topples Maldonado's Cordova argument. We are unconvinced.

The critical flaw in this argument is the government's misunderstanding of § 734. That statute provides, in pertinent part, that "[t]he statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States." 18 U.S.C. § 734. The import of this language is clear: federal laws — with an exception, which need not concern us, for those that are "locally inapplicable" — apply in Puerto Rico just as they do in the United States. The text does not support the government's position that the interpretation of a particular statute's application to Puerto Rico is frozen in time — notwithstanding the evolution of Puerto Rico's relationship with the United States — until Congress says otherwise.

Moreover, the government's interpretation of § 734 is not merely textually baseless; it is also entirely unsupported by our case law. Section 734 is most often invoked when a federal statute is silent on whether it applies to Puerto Rico; in these circumstances, reliance on § 734 solidifies the conclusion that

Puerto Rico is within the statute's reach.  See, e.g., United States v. Acosta-Martinez, 252 F.3d 13, 18, 20 (1st Cir. 2001) (explaining the "default rule . . . that, as a general matter, a federal statute does apply to Puerto Rico pursuant to 48 U.S.C. § 734" and holding that the Federal Death Penalty Act applies to Puerto Rico); United States v. Villarin Gerena, 553 F.2d 723, 724-26 (1st Cir. 1977) (rejecting argument that 18 U.S.C. § 242 does not apply to Puerto Rico); Moreno Rios v. United States, 256 F.2d 68, 71-72 (1st Cir. 1958) (holding that the Narcotic Drugs Import and Export Act — which applied to "the several States and Territories, and the District of Columbia" — applied to Puerto Rico and continued to do so after 1952).  In this case, however, we are not confronted with the question of whether § 2421(a) applies to Puerto Rico in the first place (it indisputably does), but rather with the more nuanced question of whether, in light of the events that culminated in the adoption of the Puerto Rico Constitution, it continues to apply to Puerto Rico as a territory or instead treats it as a state.  Neither § 734 nor our case law interpreting that statute aids us in answering that question.

The government doubles down on its interpretation of § 734 by relying on a single sentence from our decision in United States v. Quinones, 758 F.2d 40, 43 (1st Cir. 1985):  "The congressional intent behind the approval of the Puerto Rico Constitution was that the Constitution would operate to organize

- 17 -

a local government and its adoption would in no way alter the applicability of United States laws and federal jurisdiction in Puerto Rico."  But Quinones, like all of the other cases citing § 734, does not support the government's reading of that statute.

The defendant in Quinones argued that the wiretap provision in the Omnibus Crime Control Act did not apply to Puerto Rico because a provision of the Puerto Rico Constitution prohibited wiretapping in the commonwealth.  Id. at 41.  The linchpin of this argument was the defendant's belief that the Puerto Rico Constitution had the force of federal law because it was approved by Congress.  Id.  We rejected that argument and, in doing so, explained that, "[w]hile the creation of the Commonwealth granted Puerto Rico authority over its own local affairs, Congress maintains similar powers over Puerto Rico as it possesses over the federal states."  Id. at 43.  We then explained, using the language that the government seizes on in this case, that Congress did not intend the Puerto Rico Constitution to "alter the applicability of United States law and federal jurisdiction in Puerto Rico."  Id.

Properly understood, then, Quinones stands for the unremarkable proposition that a provision of the Puerto Rico Constitution cannot prevail where it conflicts with applicable federal law — a proposition that applies equally to state constitutions.  See Acosta-Martinez, 252 F.3d at 18 (relying on Quinones to reject the argument that the Federal Death Penalty Act

- 18 -

should not apply to Puerto Rico because a provision of the Puerto Rico Constitution banned the death penalty; "a provision of the Constitution of Puerto Rico does not trump a federal criminal statute, where Congress intends to apply the statute to Puerto Rico"; "[T]he Constitution of Puerto Rico governs proceedings in the Commonwealth courts; this is true of state constitutions and proceedings in state courts.  Those constitutions do not govern the definitions or the penalties Congress intends for federal crimes." (citation omitted)).  Nothing in Quinones (or any other decision) supports the government's view that § 734 freezes in time a pre-1952 interpretation of a statute's application to Puerto Rico.  As was true in Cordova, we remain free to reexamine our pre-1952 decision in Crespo in light of the evolution of the relationship between Puerto Rico and the United States.

For these reasons, we conclude that Crespo no longer settles the question of whether § 2421(a) covers transportation that occurs entirely within Puerto Rico.  Instead, as Maldonado argues, the Cordova analytical framework must guide our analysis of whether we should treat Puerto Rico as a state or a territory for purposes of § 2421(a).  We now turn to this inquiry.

### B.  Applying Cordova

As a general matter, "[w]hether Puerto Rico is to be treated as a state or a territory for purposes of a particular statute that does not mention it specifically 'depends upon the

- 19 -

character and aim of the act.'" Jusino Mercado, 214 F.3d at 40 (quoting Shell Co., 302 U.S. at 258). This inquiry entails construing the text of the statute "to effectuate the intent of the lawmakers" and considering, in addition to the words in the statute, "the context, the purposes of the law, and the circumstances under which the words were employed." Cordova, 649 F.2d at 38 (quoting Shell Co., 302 U.S. at 258). As we have noted, "[i]n certain circumstances, Puerto Rico's changing status complicates this task," Jusino Mercado, 214 F.3d at 40, and our attempt to discern congressional intent behind the statute under review comes with a unique twist: an assumption that, when enacting the statute, Congress was aware of how the relationship between Puerto Rico and the United States would develop in the decades to come. See id.; Cordova, 649 F.2d at 39. This is such a case.

Thus, we ask "whether the [Mann] Act's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act." Cordova, 649 F.2d at 39. There are "two possible avenues" by which we might reach the conclusion that Congress intended to treat Puerto Rico differently than the states: "an express direction in the statutory text or some other compelling reason." Jusino Mercado, 214 F.3d at 42. The first avenue is closed to us because the Mann Act does not expressly indicate that Puerto Rico

- 20 -

is to be treated as a territory or that transportation that occurs solely within Puerto Rico suffices.  Cf. Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 320-23 & n.3 (1st Cir. 2012) (rejecting argument, based on Cordova, that the Buy American Act (BAA) did not apply to Puerto Rico — just as it did not apply to the states — because, among other reasons, the BAA explicitly encompassed construction projects occurring in Puerto Rico; court distinguished Cordova on this basis).[7]

All that remains for the government, therefore, is the second avenue — "some other compelling reason" — which requires "'specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state.'"  Jusino Mercado, 214 F.3d at 42-43 (quoting Cordova, 649 F.2d at 42).  The government argues that the committee reports that accompanied the passage of the Mann Act in 1910 satisfy this requirement.  We disagree.

---

[7] The Mann Act's failure to include Puerto Rico explicitly also distinguishes this case from United States v. Beach, 324 U.S. 193, 195 (1945) (per curiam), in which the Supreme Court held that the Act covered transportation that occurs solely within the District of Columbia.  When Beach was decided, the Mann Act prohibited illicit transportation "in the District of Columbia." Pub. L. No. 61-277, § 2, 36 Stat. at 825; see also Beach, 324 U.S. at 195.

- 21 -

The committee reports merely discuss application of the Mann Act to transportation within territories as a general matter without mentioning Puerto Rico, and they do not suggest any reason why Congress might have intended to regulate transportation in Puerto Rico in particular. Cf. Dávila-Pérez v. Lockheed Martin Corp., 202 F.3d 464, 467-68 & n.4 (1st Cir. 2000) (concluding that the Defense Base Act (DBA) — which covered military bases "in any Territory or possession outside of the continental United States" — continued to apply to Puerto Rico after 1952 because, among other reasons, the legislative history of the DBA "specifically indicat[ed] that Puerto Rico is within the reach of the Act" (citing H.R. Rep. 77-1070, at 4 (1941))). The most that can be said about the committee reports in this case is that they indicate (as the government argues) that Congress intended to exercise its regulatory authority to the fullest extent permissible under the Constitution when it passed the Mann Act.

But this alone is not enough for the government to prevail under the Cordova test. In Shell Co., the Supreme Court explained that, in passing the Sherman Act, Congress intended "to exercise all the power it possessed." 302 U.S. at 259 (quoting Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 435 (1932)). In Cordova, we recognized Congress's intent to legislate as broadly as possible, 649 F.2d at 39, but we nonetheless determined that there was no specific evidence or clear policy reason embedded in

- 22 -

the Sherman Act from which to conclude that Congress intended the Act to intervene more extensively into the local affairs of Puerto Rico than into the local affairs of a state, see id. at 41-42. So too here. The fact that Congress in 1910 intended to legislate to the full extent of its powers in passing the Mann Act fails in and of itself "to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." Id. at 42 (emphasis added).

The government, though, has a fallback: the post-1952 amendments to the Mann Act. It postulates that, because none of these amendments "excluded Puerto Rico from the definition of 'Territory or Possession of the United States'" and because we must presume that Congress was aware of our holding in Crespo when it subsequently amended the Mann Act, these amendments demonstrate Congress's intent for Puerto Rico to remain a territory under § 2421(a). Once again, however, we are unpersuaded that this evidence satisfies Cordova's compelling-reasons hurdle.

For starters, the Mann Act does not provide a definition of "Territory or Possession of the United States." In this respect, this case is unlike Dávila-Pérez, upon which the government relies. That case involved the DBA, which applies to United States military and naval bases "in any Territory or possession outside the continental United States," 42 U.S.C.

- 23 -

§ 1651(a)(2), and defines "continental United States" as "the States and the District of Columbia," id. § 1651(b)(4).  In concluding that the DBA applied to United States military bases located in Puerto Rico in Dávila-Pérez, we deemed it significant that Congress added the definition of "continental United States" seven years after the Puerto Rico Constitution went into effect, while simultaneously making it explicit that the DBA did not apply to Alaska, which had recently achieved statehood.  See Dávila-Pérez, 202 F.3d at 469 ("Most important, the definition of 'continental United States' was added to the [DBA] only seven years after the alleged change in Puerto Rico's status without any reference to that fact.  In sharp contrast, in response to Alaska's transition from a territory to a state, Congress immediately deleted the reference to Alaska in the [DBA] and added the definition of 'continental United States' to ensure that Alaska was excluded from the scope of the Act." (citation omitted)).  The same cannot be said for the Mann Act; none of the post-1952 amendments to § 2421 indicate a congressional intent to treat Puerto Rico as a territory under that section.

Moreover, with the exception of the elimination of the District of Columbia — which was, unlike Puerto Rico, specifically enumerated in the text of § 2421 (and its predecessors) until 1986[8]

---

[8] Compare Pub. L. No. 80-772, 62 Stat. at 812 (prior version of § 2421 reaching illicit transportation "in the District of

- 24 -

— none of the post-1952 amendments to the Mann Act have altered the territory-or-possession language in § 2421.[9]  See 18 U.S.C. § 2421(a) (reaching illicit transportation "in any Territory or Possession of the United States"); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 303, 129 Stat. 227, 255-56 (enacting § 2421(a) with this same language); Pub. L. No. 99-628, § 5(b), 100 Stat. at 3511 (1986 reenactment of § 2421 with this same language); Pub. L. No. 80-772, 62 Stat. at 812 (1948 codification of § 2421 with this same language); see also Protection of Children From Sexual Predators Act of 1998, Pub. L. No. 105-314, § 106, 112 Stat. 2974, 2977 (amending other language of § 2421 in a manner not relevant here).  This post-1952 legislative history does not constitute the sort of specific evidence or clear policy reasons that Cordova requires; instead, it stands in stark contrast to the post-constitutional legislative history with which we have been confronted in other cases.

---

Columbia"), and Pub. L. No. 61-277, § 2, 36 Stat. at 825 (same in predecessor to § 2421), with Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, § 5(b), 100 Stat. 3510, 3511 (omitting District of Columbia in § 2421).

[9] As we explain below, see infra note 10, another provision of the Mann Act, § 2423(a), has a more eventful history than its counterpart in § 2421.  The "in any Territory or Possession of the United States" language in § 2421, by contrast, has remained unchanged since 1948.  See supra note 3 (explaining addition of the term "Possession" in 1948).

For example, in Antilles Cement, we concluded that two aspects of the post-1952 legislative history of the BAA supported our conclusion that the Act continued to apply to Puerto Rico even though it did not apply to the states. 670 F.3d at 321. First, we noted that Congress overhauled and reenacted the BAA in 2011, leaving the explicit statutory reference to Puerto Rico intact. Id. We explained that "[w]e [could] think of no better indicator of Congress's intent to include Puerto Rico within the reach of the BAA than its overhauling the BAA yet preserving the law's explicit application to the Commonwealth." Id. Second, we deemed Congress's decision to retain the explicit reference to Puerto Rico all the more significant when juxtaposed with Congress's diligence "in amending the BAA to remove entities that it no longer intends to cover"; Congress promptly amended the BAA to remove the explicit references to Alaska and Hawaii once those former territories achieved statehood. Id. Similarly, in Dávila-Pérez, we contrasted Congress's immediate deletion of the explicit reference to Alaska in the DBA once the former territory obtained statehood with the post-1952 addition of a definition of the "'continental United States' . . . without any reference" to the Puerto Rico Constitution or Puerto Rico's commonwealth status. 202 F.3d at 469.

Unlike the post-1952 legislative history that we examined in Antilles Cement and Dávila-Pérez, the post-1952

- 26 -

amendments to the Mann Act do not indicate that Congress intended § 2421(a) to intervene more extensively into the local affairs of Puerto Rico than into the local affairs of the states. See Cordova, 649 F.2d at 42. Therefore, these amendments cannot satisfy the Cordova test.

Finally, the government insists that there are clear policy reasons for applying § 2421(a) to transportation that occurs solely within Puerto Rico. Offering two documents — a research paper on human trafficking in Puerto Rico and the United States Department of State Trafficking in Persons Report from 2014 — the government argues that "[t]ransportation of sex-crime victims within Puerto Rico is a pervasive problem, and the federal government's prosecutorial authority under Section 2421 is a significant bulwark."

We do not doubt the seriousness of the human-trafficking situation in Puerto Rico that is relayed in the government-cited documents. But Cordova requires that the "clear policy reasons" be "embedded in [the] particular statute," and the "specific evidence" that Cordova discusses similarly must "demonstrate a statutory intent" to treat Puerto Rico as a territory instead of a state. 649 F.2d at 42 (emphasis added). In short, the specific evidence or clear policy reasons must be responsive to the key congressional-intent question that we must address: "whether the [Mann] Act's framers, if aware of Puerto Rico's current

constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act." Id. at 39. Because the government's documents tell us nothing about what Congress intended, they do not help us answer this critical question.

In sum, against the backdrop of clear congressional intent to grant Puerto Rico state-like autonomy, see Examining Bd., 426 U.S. at 594; Cordova, 649 F.2d at 42, we have not found specific evidence or clear policy reasons embedded in § 2421(a) to suggest that, had the framers of that section known of the evolution of the relationship between Puerto Rico and the United States that took place in the decades since the passage of the Mann Act, they would have intended § 2421(a) to intervene in Puerto Rico's local affairs more extensively than it intervenes in the states' local affairs. We therefore must conclude that, had the framers foreseen these developments, they would have intended that § 2421(a) treat Puerto Rico similarly to the states. Accordingly, we hold that § 2421(a) does not extend to illicit transportation that occurs solely within Puerto Rico; instead, it reaches only transportation "in interstate or foreign commerce" with respect to the island.[10]

_____

[10] In reaching the same conclusion, the district court also relied on the 1998 amendment to § 2423(a), another provision of the Mann Act, and the enactment of 18 U.S.C. § 2426. In 1998, Congress amended § 2423(a) to increase the maximum penalty for that offense. See H.R. Rep. No. 105-557, at 22 (1998). Before the bill was enacted, a floor amendment proposed adding the word

- 28 -

We emphasize that our holding today is a narrow one: it applies only to the scope of § 2421(a), and not to the other provisions of the Mann Act. We therefore need not and do not express an opinion on whether those other provisions cover transportation that occurs solely within Puerto Rico.[11]

---

"commonwealth" to the phrase "in any territory or possession of the United States" in § 2423(a); the floor amendment passed without explanation. 144 Cong. Rec. S12,262 (daily ed. Oct. 9, 1998) (statement of Sen. Coats). The enacted amendment to § 2423(a) therefore reached illicit transportation "in any commonwealth, territory or possession of the United States." Pub. L. No. 105-314, § 103, 112 Stat. at 2976; see also id. § 104(a), 112 Stat. at 2976 (adding 18 U.S.C. § 2426, which provided the following definition of "State" for the purposes of that section: "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States"). The "commonwealth, territory or possession" language has remained in § 2423(a) ever since. See 18 U.S.C. § 2423(a); see also id. § 2426 (containing same definition of "State" for purposes of that section as was contained in Pub. L. No. 105-314).

Like the district court, Maldonado stresses to us the importance of the addition of the commonwealth language in §§ 2423(a) and 2426. But because Cordova is alone sufficient to support our conclusion in this case, we need not — and therefore do not — express any opinion on this issue.

[11] Proceeding under the assumption that § 2423(a) covers illicit transportation that occurs solely within Puerto Rico — a matter on which we express no opinion — the government argues that our conclusion that § 2421(a) does not apply to such transportation creates an absurd result. We are unmoved. Even if the government is correct that the two provisions diverge in scope with respect to intra-Puerto Rico transportation (and we emphasize "if"), we are not convinced that such a result is absurd; the two provisions employ different language to identify the transportation covered, they specify separate crimes against separate classes of victims, and they have not been amended in lockstep with one another. In short, it is not at all clear to us that Congress intended the two provisions to have the same scope. In this case, we are called upon to decide only whether § 2421(a), not § 2423(a), reaches illicit transportation that occurs solely within Puerto Rico. For

## Conclusion

For these reasons, we affirm the district court's dismissal of the indictment.

---

reasons already explained, <u>Cordova</u> provides the appropriate analytical framework for deciding that question and leads us to the conclusion that we reach. The government has not explained — and we cannot discern — why the assumed scope of a different statutory section should alter our <u>Cordova</u> analysis of the scope of § 2421(a).