# United States Court of Appeals
## For the First Circuit

No. 20-1724

DEBRA KATZ,

Plaintiff, Appellant,

v.

BELVERON REAL ESTATE PARTNERS, LLC; MATTHEW ORNE; AHP HOLDINGS,
LLC; GRANT SISLER,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Arias-Marxuach,* District Judge.

David B. Mack, with whom Stephanie R. Parker and O'Connor
Carnathan & Mack LLC were on brief, for appellant.
Erika L. Todd, with whom Patrick P. Dinardo and Sullivan &
Worcester LLP were on brief, for appellees Belveron Real Estate
Partners, LLC and Grant Sisler.
John J. O'Connor, with whom Kristyn M. Kelley and Peabody &
Arnold LLP were on brief, for appellees AHP Holdings, LLC and
Matthew Orne.

March 8, 2022

---

* Of the District of Puerto Rico, sitting by designation.

**Arias-Marxuach, <u>District Judge</u>.**  Appellant Debra Katz is a sophisticated real estate investor currently suffering from seller's remorse.  In late 2014, Katz sold her 48% special limited partnership interest in an affordable housing property ("the Property") to AHP Holdings, LLC for $1.5 million.  Katz maintains she had no interest in selling her share, and only did so because she was fraudulently led to believe that Belveron Real Estate Partners, LLC had power over said Property and would block any attempt to sell or refinance it.  In 2016, due to a major uptick in the market for analogous housing projects, the Property sold for an unexpected $11.7 million.

Katz filed suit alleging claims for fraud, civil conspiracy, breach of fiduciary duty, and unjust enrichment, among others.  The district court entered summary judgment dismissing the suit.  It found that Katz failed to amend her complaint to incorporate an updated theory of fraud, after the one she initially proffered was disproven during discovery.  Moreover, the district court held that Katz's unpled theories failed on the merits because any misrepresentations were not material and, in any event, she did not suffer any actionable damages because she received a fair price for her interest.

Katz appeals this determination, contending the defendants had adequate notice of her refined theory of fraud.  She also argues the lower court did not adequately consider that

absent Appellees' alleged misrepresentations, she would not have sold her interest at all.  Therefore, regardless of the sales price of her special interest, she is "worse off" than if she had retained her interest and profited from the subsequent sale of the Property.  Applying the summary judgment motion standard, we find that Katz has failed to make a sufficient showing on essential elements of her case.  Thus, we confirm the district court's dismissal, albeit on partially different grounds.

**I.**

Appellant Debra Katz ("Katz") is a real estate investor who founded her own property management company in 1997 and has been the general partner of three housing projects.  She has lived in the Springfield, Massachusetts area nearly her entire life.

In 1983, her father, Alfred Katz, formed Falls View Associates Limited Partnership ("Falls View" or the "Partnership").  Falls View developed a 130-unit affordable housing complex in Chicopee, Massachusetts ("the Property").  Upon Alfred Katz's death in 2000, Katz inherited his Special Limited Partnership Interest ("Special Interest") in Falls View, totaling 48%.  This Special Interest did not give Katz any voting rights or control over the Partnership.  Instead, in the event of a liquidity event, *i.e.* the sale or refinance of the Property, Katz would be entitled to receive a proportionate share of the proceeds.

Pursuant to the Partnership Agreement ("Agreement"),

when Katz became involved in the Partnership, Paul Oldenburg ("Oldenburg") was the General Partner of Falls View and Wilder Richman Corporation 1983 Investor Limited Partnership ("WRC") was the sole limited partner. Gina Dodge ("Dodge") was a WRC employee and its point person for matters related to the Partnership.

Appellees Belveron Real Estate Partners LLC ("Belveron") and AHP Holdings, LLC ("AHP"), which were separately owned, invested in limited partnerships that held affordable or federally subsidized housing projects. In August 2014, Belveron Partners Fund III JV, LLC (the "Fund"), a Belveron affiliate, obtained 25.74% of limited partnership interest in WRC. At that time, AHP already owned a 25.74% interest in WRC. Therefore, in the aggregate, the Fund and AHP had obtained over 51% economic interest in WRC. However, neither Belveron, the Fund, nor AHP were admitted as substitute limited partners of WRC, nor did any of these entities acquire voting rights in WRC.

In August 2014, the Property's thirty-year mortgage matured, and the Property was poised to either be sold or refinanced. Katz favored either option in lieu of selling her Special Interest. Notably, a sale could not occur without the approval of the Property's General Partner, Oldenburg.

In the fall of 2014, Grant Sisler ("Sisler"), Belveron's Vice President of Operations, contacted Katz and inquired if she would be willing to sell her Special Interest to Belveron for $1.1

- 4 -

million. To justify this offer, Sisler provided Katz with refinance estimates and concluded that: "the proceeds out to the limited partners is just over $4M (best case scenario) and $3.24M at the worst case scenario. . . At the higher refinance number ($4.038M) I estimate that you get back just over $1M and at the lower refinance number, you would receive around $750k." On November 5, 2014, Sisler notified Katz via e-mail that he could not match her $1.8 million asking price and $1.2 million was the highest amount he could offer for her Special Interest. Sisler argued that Katz would receive less after a refinance and that Belveron would "block attempts to sell the [P]roperty." Ultimately, Sisler and Katz did not reach an agreement. Katz has since testified that she would not have sold to Belveron because Sisler "didn't have an incredibly good reputation" and was aggressive.

Parallel to these negotiations, Oldenburg told Katz that Sisler was making decisions regarding the Property. This gave her the feeling that Sisler was "acting as a de facto general partner" of the Property. Despite this belief, Katz did not ask Belveron what kind of interest it had in the Property, whether it had a voting interest in WRC, or whether it had a majority ownership of WRC. Katz became concerned that she would be trapped indefinitely in Falls View, holding an illiquid Special Interest with no say regarding the Property. Upon being told by Oldenburg that there

- 5 -

was no plan to sell or refinance the Property, she asked if he would be interested in purchasing her interest for more than $2 million. Oldenburg declined.

In the same November 5, 2014, e-mail that Sisler sent Katz, Sisler copied Matthew Orne ("Orne"), AHP's agent, in case AHP was interested in purchasing Katz's Special Interest. Sisler noted that Katz thought Belveron and AHP worked together and stated that they were "very different" companies that both operate in the secondary market. In early December 2014, Orne forwarded said email to Katz, and inquired about purchasing her Special Interest. On December 17, 2014, Katz agreed to sell her Special Interest to AHP for $1.5 million and signed an Agreement with AHP to that end. Under the terms of the Agreement, the transfer of Katz's Special Interest to AHP required the General Partner's consent, therein identified as Oldenburg. Furthermore, the Agreement did not prohibit AHP from subsequently selling the Special Interest to another party. Katz was represented by legal counsel during the process of selling her Special Interest to AHP. Although she had been provided information regarding the Partnership's finances for 2013, Katz did not have the Property nor her Special Interest appraised prior to the sale of her Special Interest.

Unbeknownst to Katz, although Belveron and AHP were unaffiliated companies, they had a "gentlemen's agreement" where if both companies were involved in a partnership, and one of them

- 6 -

bought an additional interest, they would offer the other company an opportunity to purchase half the interest acquired. Pursuant to this agreement, once AHP purchased Katz's Special Interest, it opted to split it with Belveron, although not obligated to do so. Accordingly, AHP transferred 50% of Katz's Special Interest to the Belveron affiliated Fund on February 27, 2015. AHP and Belveron made the transfer public on March 13, 2015.

After purchasing Katz's Special Interest, AHP and the Fund worked to acquire the interests of other WRC investors. Despite this, Belveron and AHP were not interested in selling the Property given its substantial guaranteed cashflow. This changed in late 2015 when Andrew Daitch ("Daitch"), a real estate professional working in the Affordable Housing Advisors group at Marcus & Millichap, informed them that the real estate market had experienced significant growth that year and foreign buyers were investing large sums of money in similar housing projects. Accordingly, Daitch told Orne he believed he could sell the Property for $11 million. Sisler and Orne were highly skeptical of said sales price, assuming that the Property was worth closer to $6.5 million. In 2016, to the investors' surprise, the Property sold for $11.7 million.

## II.

On September 29, 2017, Katz filed suit against eight defendants: (a) Belveron and its employee Sisler; (b) AHP and its

agent Orne; and (c) WRC, its agent Dodge, its General Partner, and its investor service agent (the "WRC Defendants"). Promptly thereafter, Katz amended the complaint, dismissing her claims against the WRC Defendants. In the amended complaint, she alleged that Belveron fraudulently misled her as to the value of her Special Interest and its intention to hold the Property in lieu of selling it. During discovery, Katz learned that, despite allegedly being told the contrary, Belveron lacked control to prevent the sale because it did not have voting rights in WRC. Katz also came to believe that AHP and Belveron misrepresented their relationship to induce her to sell her Special Interest to AHP. Lastly, it became evident that the Fund, not the named Belveron defendant, had acquired her Special Interest.

On November 6, 2018, Katz filed a motion for leave to amend the complaint, accompanied by the proposed second amended complaint. Therein, Katz articulated a modified theory of the case, pursuant to the results of discovery. Namely, she argued that Appellees engaged in fraud by misrepresenting and omitting information regarding: (1) Belveron's ability to block a sale or refinance of the Property; and (2) the relationship between AHP and Belveron. Further, Katz sought to add Oldenburg as a defendant and substitute the existing Belveron defendant for its affiliated Fund. Upon filing the motion, Katz learned that adding the Fund would destroy the court's diversity jurisdiction. To avoid a

remand, Katz withdrew her motion to amend the complaint and instead supplemented her discovery responses to incorporate her revised theory of the case.

On April 1 and 19, 2019, Belveron and AHP filed individual motions for summary judgment. Katz opposed said motions on May 17, 2019. After conducting a hearing, the district court granted the motions, holding that Katz could not amend her complaint through a subsequent brief opposing summary judgment, especially because the operative complaint did not allege the basic framework of the fraudulent scheme. Moreover, the Court also found that Katz did not properly support her unpled theories and remaining causes of action. On July 21, 2020, Katz filed this timely appeal.

## III.

Summary judgment is proper under Fed. R. Civ. P. 56(a) "when the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017). If at this stage, the nonmoving party fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof[,]" summary judgment should be granted accordingly. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

We review an order granting summary judgment *de novo*.

Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018). When conducting such a review, we are not bound by the district court's "rationale; rather, the court of appeals may affirm on any independent ground made evident by the record." González-Droz v. González-Colón, 660 F.3d 1, 9 (1st Cir. 2011) (citation omitted). Likewise, the decision to grant a motion for summary judgment may be reversed "if there are any factual issues that need to be resolved before the legal issues can be addressed." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990).

In the case at bar, "federal law supplies the applicable procedural rules and [Massachusetts] state law supplies the substantive rules of decision." Lawless, 894 F.3d at 21.

## A. Adequately pleading fraud

In the operative complaint, Katz claims that Sisler and Belveron "misrepresented the value of Ms. Katz's interest in the Company, the likelihood of the sale of the Property, and the partners' interest in selling the Property." Prior to the discovery deadline, Katz sought to amend the operative complaint to include both refined and additional theories of fraud. Specifically, she averred that Appellees fraudulently misrepresented: (1) Belveron's ability to block the Property's sale or refinance; and (2) AHP and Belveron's relationship. Katz also attempted to incorporate Oldenburg and the Fund as additional

defendants. She ultimately withdrew her motion to amend to avoid destroying diversity jurisdiction. Thus, the operative complaint remained untouched. In their motion for summary judgment, Belveron and Sisler objected to Katz's attempt to include new claims and categorized her efforts to do so as "legally irrelevant" in the absence of a formal amendment to the complaint. After this objection, Belveron and Sisler addressed Katz's refined claims on the merits. On their part, AHP and Orne contend that they relied on the fact that Katz withdrew her motion to amend the complaint and thus, there are no causes of action for fraud against them on record. The district court granted Defendants' motions for summary judgment highlighting that Katz never amended the complaint to revise her theory of fraud.

On appeal, Katz contends that the district court erred in declining to consider her unpled theories of fraud as properly before it. She maintains that by supplementing her interrogatory responses to incorporate new facts learned through discovery, she constructively amended her complaint and provided defendants with adequate notice. We review the district court's refusal to consider Katz's unpled theories of fraud for abuse of discretion. See Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 319 (1st Cir. 2012); United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC, 833 F.3d 874, 880 (8th Cir. 2016); see also Jenkins v. Hous. Ct. Dep't, 16 F.4th 8, 19 (1st Cir. 2021) ("We

- 11 -

review a district court's denial of a motion seeking leave to amend for an abuse of discretion, 'defer[ring] to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial.'" (quoting Torres-Alamo v. Puerto Rico, 502 F.3d 20, 25 (1st Cir. 2007)); Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003) ("An error of law is, of course, an abuse of discretion.").

While Fed. R. Civ. P. 15 governs when and how pleadings can be amended, it does not establish consequences for failing to amend the pleadings. Case law interpreting the federal rules of civil procedure demonstrates a "belief that when a party has a valid claim, [they] should recover on it regardless of [their] counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party[.]" 5 Wright and Miller, Fed. Prac. & Proc. Civ., § 1219 (4th ed. 2021); see also Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 622 (1st Cir. 1988) (finding that plaintiff's failure to "plead [a] particular legal theory, when it did plead two related theories" would not bar relief, especially because defendant raised specific defenses regarding the unpled theory); but see Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 76 (1st Cir. 2016) ("Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their

- 12 -

discovery efforts on the theories actually pled.").

However, Fed. R. Civ. P. 9(b) requires that allegations of fraud "must state with particularity the circumstances constituting fraud."  Therefore, a claimant must specify "what the underlying misrepresentation was, who made it, and when and where it was made."  Khelfaoui v. Lowell Sch. Comm., 496 F. Supp. 3d 683, 689 (D. Mass. 2020) (quotation omitted); see also Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).  The purpose of this rule is "to place the defendants on notice and enable them to prepare meaningful responses, to preclude the use of a groundless fraud claim as pretext for discovering a wrong, and to safeguard defendants from frivolous charges [that] might damage their reputation."  Dumont v. Reily Foods Co., 934 F.3d 35, 39 (1st Cir. 2019) (internal quotations omitted, modification in original).  Notably, "Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'"  Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 49 (1st Cir. 2020) (quoting Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 21-22 (1st Cir. 2017)).

Appellant was clearly aware of the need to amend her fraud allegations and easily could have done so against the named defendants, even at a belated stage of the proceedings.  See, e.g., Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126

- 13 -

(1st Cir. 2006) (reaffirming that a plaintiff can tender an amended complaint after a motion for summary judgment has been filed if they show "that the proposed amendments were supported by substantial and convincing evidence" (quotation omitted)); Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule 15(a)]." (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)). Instead, she opted to amend her complaint through her opposition to defendants' motion for summary judgment, a practice this Court has routinely rejected. See, e.g., Montany v. Univ. of New England, 858 F.3d 34, 42 (1st Cir. 2017); Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, 659 F.3d at 53; see also Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 590 (1st Cir. 2007).

While the Federal Rules of Civil Procedure allow for the constructive amendment of a complaint in limited circumstances, the requisite conditions are not present here. Fed. R. Civ. P. 15(b)(2) provides "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." We have previously held that:

> For purposes of Rule 15(b), implied consent to

- 14 -

> the litigation of an unpleaded claim may arise from one of two generic sets of circumstances. First, the claim may actually be introduced outside the complaint—say, by means of a sufficiently pointed interrogatory answer or in a pretrial memorandum—and then treated by the opposing party as having been pleaded, either through his effective engagement of the claim or through his silent acquiescence. . . Second, and more conventionally, "[c]onsent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue."

Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995) (emphases added) (quoting DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir. 1992)); see also Scholz v. Goudreau, 901 F.3d 37, 45 (1st Cir. 2018); Antilles Cement Corp., 670 F.3d at 319 (quoting and applying Rodriguez); Lynch v. Dukakis, 719 F.2d 504, 508 (1st Cir. 1983) ("The test of consent by implication to the trial of claims not set forth in the complaint is whether a party did not object to the introduction of evidence or introduced evidence himself that was relevant *only* to that issue." (citation omitted)).

While this Court has not expressly done so, the Seventh Circuit has held that, in the "spirit of Rule 15(b)," constructive amendments to the complaint can be effected at the summary judgment stage, rather than at trial, when the parties have provided express or implied consent. Walton v. Jennings Comm. Hosp., Inc., 875 F.2d 1317, 1320 n.3 (7th Cir. 1989). The test for implied consent

at summary judgment becomes "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." Hutchins v. Clarke, 661 F.3d 947, 957 (7th Cir. 2011) (quotation omitted). Even if we were to follow the Seventh Circuit's lead and recognize a district court's discretionary authority to allow "constructive amendments" to pleadings at the summary judgment stage, as extrapolated from Rule 15(b), see, e.g., Torry v. Northrop Grumman Corp., 399 F.3d 876, 877-78 (7th Cir. 2005), here, the district court acted within its discretion in determining that unpled claims were not properly before it.

Even though defendants acknowledged Katz's unpled claims in their motions for summary judgment, they only did so after explicitly objecting to their inclusion. Cf. Action Mfg., Inc. v. Fairhaven Textile Corp., 790 F.2d 164, 167 (1st Cir. 1986) ("As a general principle the presentation of claims beyond the complaint without objection is considered an informal amendment of the complaint." (emphasis added)). By arguing that Katz's decision to withdraw her proposed amended complaint rendered her new theories legally irrelevant and ineffective, defendants precluded a finding that they "engaged or embraced," and thus implicitly consented to, said claims becoming part of the proceedings. Rodriguez, 57 F.3d at 1173; see also Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 232 (1st Cir. 2003) ("It

- 16 -

is not enough that an issue may be 'inferentially suggested by incidental evidence in the record;' the record must indicate that the parties understood that the evidence was aimed at an unpleaded issue.'" (quoting Galindo v. Stoody Co., 793 F.2d 1502, 1513 (9th Cir. 1986)).

As noted earlier, although she withdrew her motion to amend, Katz contends that defendants were on notice of her new theories by way of her supplemental responses to their interrogatories, which she served a few weeks before the close of discovery and in advance of her second day of deposition testimony. Specifically, this five-page document attached Katz's proposed amended complaint -- withdrawn with her motion to amend, two months prior -- and broadly purported to "incorporate [its] allegations . . . insofar as they pertain to the conduct, misrepresentation and omissions of the individuals with whom she communicated during the relevant time period." She then vaguely "refer[red]" the defendants to the withdrawn amended complaint as a supplemental response to one interrogatory, without any further explanation or citation. Whatever the potential legal significance of this attempted end-around Rule 15, the supplemental response is not sufficiently informative to satisfy Rule 9(b)'s particularity requirement. See Rodriguez, 57 F.3d at 1171-72. Moreover, the defendants' failure to immediately move to strike the response can hardly be viewed as acquiescence sufficient to amount to implied

consent that the new issues would be litigated. Given the absence of defendants' consent, implied or otherwise, coupled with Katz's failure to plead fraud pursuant to the heightened standard imposed by Rule 9(b), the district court did not abuse its discretion in determining that Katz's unpled theories were not properly before it.

## B. Fraud on the merits

Under Massachusetts law, the elements for common law fraud and fraudulent inducement are the same. See United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 199 (D. Mass. 2004). To prove either cause of action, the petitioner must establish that: "(1) the statement was knowingly false, (2) defendants made the statement with the intent to deceive, (3) the statement was material, (4) plaintiff reasonably relied on the statement, and (5) plaintiff was injured as a result of its reliance." Id. (citing Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986) (applying Massachusetts law)).

As discussed above, Katz alleges Belveron and Sisler misrepresented the likelihood of a sale, as well as the value of the Property and her Special Interest. She affirms that absent these misrepresentations; she would not have sold her Special Interest. Even when viewing the record in the light most favorable to Katz, her claims of fraud fail on the merits.

The record reflects that statements made by Sisler and

Belveron regarding the likelihood of a sale and the value of the Property were not knowingly false.  Katz has reiterated throughout litigation that she believed her Special Interest and Property were worth more than Appellees stated when trying to purchase her interest.  Yet, Sisler supported his initial $1.1 million offer with **two** refinancing estimates.  See Zimmerman v. Kent, 575 N.E.2d 70, 75 (Mass. App. Ct. 1991) ("A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment.").  Even after the sale, internal communications show that Sisler believed that in 2016, the Property was worth approximately $6.5 million.

On her part, Katz only offers her personal unsubstantiated assessment as proof that the Property was worth more than what Appellees represented.  This is insufficient to controvert the evidence on the record or otherwise establish that Belveron and Sisler intentionally misrepresented the value of the Property and her Special Interest.  Notably, she did not have the Property nor her Special Interest appraised prior to accepting AHP's $1.5 million offer.  On one hand, Katz asserts that her real-estate experience alone qualifies her to determine that Belveron misrepresented the value of the Property.  On the other hand, Katz wants to maintain that she lacked the ability to adequately assess Belveron and AHP's offers.  She cannot have it both ways.

Similarly, Appellees have shown they were intent on retaining the Property due to its substantial and guaranteed cashflow. They allowed Daitch to pursue a potential sale solely given a recent shift in the real estate market. However, Appellees expressed surprise and shock when the Property fetched $11.7 million. Once again, Katz has not been able to controvert that, when they were made, the pertinent representations regarding keeping the Property were not knowingly false or reckless.

## C. **Katz's remaining claims**

Beyond fraud, Katz asserts several causes of action, all of which are equally unsuccessful in the absence of wrongdoing or foreseeable damages.

### i. **Civil conspiracy**

There are two types of civil conspiracy under Massachusetts law:

> One, based on section 876 of the Restatement [(Second) of Torts], is a form of vicarious liability for the <u>tortious conduct of others</u> . . . The other, drawn from the common law, amounts to a very limited cause of action in Massachusetts for civil conspiracy based on the defendants' allegedly unique ability to exert a "peculiar power of coercion" when acting in unison.

<u>Snyder</u> v. <u>Collura</u>, 812 F.3d 46, 52 (1st Cir. 2016) (emphasis added) (quotations and citations omitted). The record reflects that Katz

is asserting the former, which "requires an underlying tort."[1] Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009). Having already rejected Appellant's theory of fraud, her civil conspiracy claim necessarily faces the same fate.

### ii. Breach of fiduciary duty

It is uncontested that neither Belveron nor Sisler had a fiduciary duty towards Katz under the law or the Partnership Agreement. Instead, Appellant alleges that through their conduct, *i.e.* by acting as the *de facto* general partner and assuming an authoritative role over the future of the Property, they imposed a fiduciary duty upon themselves.

Massachusetts courts have recognized that "though business transactions conducted at arm's length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another." Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) (citation omitted). To determine if this transformation has occurred, "courts look to the defendant's knowledge of the plaintiff's reliance and consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the readiness of the plaintiff to follow

---

[1] The district court's order granting summary judgment notes that "Plaintiff correctly disclaimed a 'coercion' conspiracy claim at the hearing[.]" Katz's Brief on appeal is consistent with this.

the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." Smith v. Jenkins, 732 F.3d 51, 63 (1st Cir. 2013) (quoting Indus. Gen. Corp., 44 F.3d at 44) (internal quotation marks omitted).

Katz's testimony reflects a lack of trust in Sisler and, by extension, Belveron. Therefore, it is contradictory to claim that she relied on their statements. Even more so considering she opted not to enter a business transaction or agreement with them. See Indus. Gen. Corp., 44 F.3d at 45 (finding no fiduciary duty between product developer and parts' supplier, despite developer's "overall 'management' role" in supplier's transaction with contract manufacturer, where developer did not direct the terms of the transaction, but merely "directed [supplier] to deal directly with [manufacturer]"). Lastly, all parties involved were sophisticated and experienced with analogous real estate ventures. There is no evidence that Katz had such a disparate capacity or knowledge that a fiduciary duty could be imposed on Sisler or Belveron.

### iii. Unjust enrichment

Katz's request for equitable relief also lacks merit. An unjust enrichment claim "cannot stand where there is an existing, express contract, unless the contract is not valid." Philibotte v. Nisource Corp. Servs. Co., 793 F.3d 159, 167 (1st Cir. 2015) (emphasis added); see also Shaulis v. Nordstrom, Inc.,

865 F.3d 1, 16 (1st Cir. 2017) ("Massachusetts law does not permit litigants to override an express contract by arguing unjust enrichment.") (internal quotation omitted); Skyview Fin. Co., LLC v. Kearsarge Trading, LLC, Civil Action No. 20-11666-PBS, 2021 WL 1930609, at *4 (D. Mass. Feb. 24, 2021) ("Because the relationship between the parties is governed by contract, unjust enrichment is not an available remedy.").

Katz sold her Special Interest to AHP for $1.5 million via a written Agreement. We have already rejected Appellant's contention that she was fraudulently induced into this sale. Furthermore, Katz has not proffered any other grounds that could render the existing Agreement invalid. See Monus v. Colo. Baseball 1993, Inc., 103 F.3d 145, at *15 (10th Cir. 1996) (unpublished) ("Having received the benefit of the bargain he agreed to, plaintiff has made no showing that there are inequitable circumstances justifying his claim of unjust enrichment."). Therefore, the Agreement precludes her unjust enrichment claim as to AHP.

We recognize that neither Sisler, Orne, nor Belveron were parties to this Agreement. However, "[t]o recover for unjust enrichment, the plaintiff must establish not only that the defendant received a benefit, but also that such a benefit was unjust." Baker v. Equity Residential Mgmt., L.L.C., 390 F. Supp. 3d 246, 258 (D. Mass. 2019) (internal quotation omitted). Katz

- 23 -

has not evinced that Sisler or Orne personally benefited from the sale of her Special Interest. Rather, she merely posits that such personal gain can be inferred. Yet, it was not Belveron but the affiliated Fund, who is not a party in this lawsuit, that obtained a portion of Katz's Special Interest from AHP. Thus, there are no grounds on which to find that Belveron received a benefit.

### iv. Tortious interference

To prevail on a claim for tortious interference with a contract or business relations, a plaintiff must prove that: "1) he or she has a contractual or advantageous relationship with another, 2) the defendant knowingly induced a breach of that contract or relationship, 3) the defendant's interference, in addition to being intentional, was improper in 'motive' or 'means' and 4) the plaintiff was harmed by the defendant's actions." Carp v. XL Ins., 754 F. Supp. 2d 230, 233–34 (D. Mass. 2010) (citing Cancellieri v. Northeast Hosp. Corp., No. CIVA 07-01659C, 2009 WL 765060, at *5 (Mass. Super. March 20, 2009).[2] Even supposing Katz had a contractual or advantageous business relationship with the Falls View Partnership, we agree with the district court's reasoning that no improper motive was at work. Here, Appellant

---

[2] In the operative complaint, Katz labels her claim for tortious interference as one with *contract*. However, she discusses both types in her opposition to AHP's motion for summary judgment. Ultimately, the District Court dismissed her claims for tortious interference both with contract and with an advantageous business relationship.

- 24 -

avers that misrepresentations are a quintessential form of improper means. However, given that fraud has not been established, Katz has not shown that the Appellees employed improper means or otherwise "acted out of any purpose beyond the 'legitimate advancement of [their] own economic interest[.]'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 107 (1st Cir. 2009) (emphasis added) (quoting Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 245-46 (Mass. App. Ct. 2004)). Katz entered into a valid agreement to sell her Special Interest, for which she was well compensated. The fact that she could have eventually profited more had she foregone the sale and retained her interest "does not render the defendant[s'] effort[s] tortious." Pembroke Country Club, Inc., 815 N.E.2d at 246.

**v. Chapter 93A**

Chapter 93A, known as the Massachusetts Consumer Protection Act, creates a cause of action for any person who, when engaging in trade or commerce, suffers a loss of money or property "as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act." Mass. Gen. Laws Ann. ch. 93A, § 11. In this context, an act is deemed unfair or deceptive if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to

- 25 -

competitors or other business people." Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 392 (Mass. 2004). Evident from this definition is that what constitutes "an actionable 'unfair or deceptive act or practice' [under Chapter 93A] goes far beyond the scope of the common law action for fraud[.]" Cardiaq Valve Techs., Inc. v. Neovasc Inc., No. 14-cv-12405-ADB, 2016 WL 1642573, at *5 (D. Mass. Apr. 25, 2016) (internal quotation omitted).

Conceding *arguendo* that unfair or deceptive practices were at play, Katz still cannot establish the requisite loss. To recover damages under Chapter 93A, a party must show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." Int'l Fid. Ins. Co. v. Wilson, 443 N.E.2d 1308, 1314 (Mass. 1983) (citing Kohl v. Silver Lake Motors, Inc., 343 N.E.2d 375, 379 (Mass. 1976)). The only loss Katz has alleged is that she was not able to participate in the unexpected 2016 sale of the Property. However, none of the alleged misrepresentations have a causal link with the subsequent sale or increase in value of the Property. The record reflects that the changes in the real estate market, the sale of the Property, and the ultimate sales price of the same were all unforeseeable. Thus, Katz cannot recover damages under Chapter 93A.

## IV.

After reviewing the record in the light most favorable

to Katz, we affirm the district court's order granting summary judgment.  Each side to bear its own costs.